THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEITH WALTERS, Defendant-Appellant.

Second District   No. 2—92—0685

Opinion filed January 28, 1994.

G. Joseph Weller and Patrick M. Carmody, both of State Appellate Defender's Office, of Elgin, and Daniel M. Kirwan and Edwin J. Anderson, both of State Appellate Defender's Office, of Mount Vernon, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers, Stephen E. Norris, Kendra S. Mitchell, and Scott A. Manuel, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McLAREN delivered the opinion of the court:

The defendant, Keith Walters, was charged with the armed robbery of an Amoco service station in Roselle, Illinois. (Ill. Rev. Stat. 1991, ch. 38, par. 18—2(a) (now 720 ILCS 5/18—2(a) (West 1992)).) Walters filed a motion to quash the arrest and suppress evidence which was denied. After a bench trial where the evidence was stipulated, Walters was found guilty of armed robbery. Walters was on probation for separate theft and burglary convictions. At the sentencing hearing, the defense stipulated to petitions to revoke probation on the prior convictions. The court imposed a sentence of 10 years' imprisonment for the armed robbery and concurrent sentences of three and five years' imprisonment on the prior convictions for which probation had been revoked. Walters appealed. The sole issue is whether the motion to quash the arrest and suppress evidence should have been granted. For the following reasons, we affirm.

At the suppression hearing, Officer David Hourigan of the Roselle police testified that on December 19, 1991, at approximately 9:15 p.m., he received a report of an armed robbery at an Amoco service station. The dispatcher reported that the suspect was a white male, 17 to 18 years old, 5 feet 8 to 5 feet 10 inches tall, with a thin build, wearing a blue denim jacket, blue jeans, and a black and orange ski mask. He was carrying a dark colored handgun.

Approximately three minutes after receiving the radio report, Hourigan stopped at a stop sign three to four blocks away from the Amoco station. He noticed an automobile stopped at another stop sign at the intersection. Three males, 17 to 18 years old, occupied the front seat. Hourigan testified that their car did not move for 30 seconds while stopped at the stop sign and the occupants appeared to stare at him. Hourigan decided the individuals matched the description of the suspect because of their denim jackets, apparent ages, and physical size. Although the individuals were seated, he estimated that they were less than six feet tall based on the manner in which they filled the automobile.

Hourigan turned on the emergency lights and aimed his spot light on the automobile. With a public address system, he instructed the driver to turn off the automobile and the occupants to put their hands up. Hourigan radioed for backup. When another sergeant arrived, Hourigan instructed the occupants to exit the vehicle and walk backwards toward him. Hourigan's gun was drawn. Walters

exited first, was handcuffed, patted down, and seated in the back of the squad car. The other occupants of the automobile, Michael Beadell, a/k/a Michael Locke, and David Sharinghousen, were handled the same way and were placed in separate squad cars.

Hourigan approached the automobile to ascertain whether there were other persons in the car. He shined a flashlight through the driver's side window and observed a silver pipe containing a green leafy substance on the console which divided the front seats. Hourigan reached in and grabbed the pipe. It smelled like marijuana. While reaching for the pipe, Hourigan observed a wad of money stuffed between the passenger's seat and the console. Hourigan further searched the automobile and found a black and orange ski mask which contained a .22 caliber revolver.

On cross-examination, Hourigan admitted that the dispatcher only gave a description for one suspect and did not give a description for a vehicle involved in the armed robbery. He was not aware of any outstanding warrants and did not observe any traffic violations.

In support of its motion to suppress, the defense argued that Hourigan had no valid reason to stop the automobile and that the defendants were arrested before probable cause existed. The State urged that Hourigan made a valid investigatory stop that he was still conducting when he observed the marijuana, thereby furnishing probable cause to arrest. The motion to suppress was denied.

On June 2, 1992, a stipulated bench trial was held. Sharinghousen's case was severed pursuant to motion by Walters. The defense noted that it would stand on its previous motion to quash and suppress, but would stipulate to the evidence offered by the State. The State indicated that it would call Shirley Elgindy, the gas station clerk, who would testify concerning the circumstances of the robbery. Officer Hourigan and Sergeants Chalupa and Dempsey would recount the details surrounding the arrest, including Walters' statement that Sharinghousen was the man who entered the service station. The court found Walters guilty of armed robbery.

Walters was on probation for separate theft and burglary convictions. At the sentencing hearing, the defense stipulated to petitions to revoke probation on the prior convictions. The court imposed a sentence of 10 years' imprisonment for the armed robbery and concurrent sentences of three and five years' imprisonment on the prior convictions for which probation had been revoked. Walters filed the instant appeal asserting that his conviction of armed robbery must be reversed because the motion to quash the arrest and suppress the evidence should have been granted.

In *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct.

1868, the Supreme Court recognized that a police officer may briefly stop and detain an individual to investigate the possibility of criminal behavior absent probable cause to arrest. The *Terry* exception to the probable cause requirement has been codified in section 107—14 of the Code of Criminal Procedure of 1963, which provides as follows:

"A peace officer, after having identified himself as a peace officer, may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit, or has committed an offense ***, and may demand the name and address of the person and an explanation of his actions. Such detention and temporary questioning will be conducted in the vicinity of where the person was stopped." Ill. Rev. Stat. 1991, ch. 38, par. 107—14 (now 725 ILCS 5/107—14 (West 1992)).

To justify an investigatory stop, the police officer must identify specific and articulable facts and reasonable inferences drawn from the officer's experience which warrant the intrusion. (*People v. Scott* (1992), 148 Ill. 2d 479, 503; *People v. Perez* (1993), 249 Ill. App. 3d 912, 917.) An objective standard is used in determining whether the facts and circumstances known to the officer at the time of the stop would warrant a person of reasonable caution to believe a stop was necessary to investigate the possibility of criminal activity. (*Scott*, 148 Ill. 2d at 503; *People v. Dionesotes* (1992), 235 Ill. App. 3d 967, 969.) When taken as a whole, the facts and inferences relied upon must lead to the conclusion that the situation is so far removed from the ordinary that any competent police officer would be expected to act quickly to maintain the status quo, rather than observe the situation further. *Perez*, 249 Ill. App. 3d at 918.

The defendant urges that the information provided to Hourigan was not enough to justify the stop, since he knew only of a lone robber on foot and not of multiple suspects in a vehicle. Citing *People v. Byrd* (1977), 47 Ill. App. 3d 804, the defendant further asserts that the description of the suspect was not distinctive and is inadequate to raise an articulable suspicion.

In *People v. Starks* (1989), 190 Ill. App. 3d 503, a police officer received information of an armed robbery by a radio transmission. The dispatcher described the suspect as a black male, 5 feet 11 inches, 160 pounds, wearing a gray jacket and slacks, black and white shoes, and one fingerless black glove. Approximately two blocks from the scene, the police officer observed a car containing four black males. Although the men were seated, the officer believed the front seat passenger was the approximate height and weight of the suspect. Upon making eye contact with the officer, the passenger slid down in

his seat until only the top of his head was visible. A few blocks away, the officer requested the vehicle to stop. He ordered the driver to approach and conducted a pat-down search for weapons. A second officer who arrived as backup approached the vehicle and observed that the passenger, the defendant, was wearing gray slacks. She drew her gun, ordered him out of the vehicle, conducted a pat-down search, and handcuffed him. Eventually, all four men in the car were handcuffed. A search of the automobile revealed one fingerless black glove and a semiautomatic pistol.

■ Distinguishing *Byrd*, we held that the facts and circumstances surrounding the *Terry* stop were sufficient to raise an articulable suspicion which justified the intrusion. Contrary to *Byrd*, where the suspect was stopped 24 hours after the robbery and 14 blocks from the scene, the defendant was observed 20 minutes after the robbery and 1¹/₂ blocks from the scene. On this basis, we opined that an individual matching a general height, weight, and racial description may be adequate to raise an articulable suspicion if the sighting is not unreasonably removed in time and space from the crime. Although the defendant's action in sliding in his seat would not raise a reasonable suspicion of criminal activity when viewed alone, the combination of the description and the defendant's actions was held to be a sufficient justification for the *Terry* stop. *Starks*, 190 Ill. App. 3d at 507-08.

In this case, Officer Hourigan received information of the armed robbery by a radio transmission. The dispatcher described the robber as a white male, 17 to 18 years of age, of a thin build, 5 foot 8 to 5 foot 10 inches tall, wearing a blue denim jacket and a ski mask, and carrying a dark colored handgun. As in *Starks*, no information about a vehicle involved in the robbery was conveyed. Officer Hourigan responded by driving toward the Amoco station through a residential neighborhood. When Hourigan stopped at a stop sign *approximately three blocks from the Amoco station and three to four minutes after receiving information of the robbery*, he observed a vehicle with three white males, approximately 17 to 18 years old, seated in the front seat. The vehicle was headed in the opposite direction of the Amoco station. Hourigan testified that two of the men wore blue denim jackets. Since Hourigan was six feet tall, he estimated the men to be less than this height based on the manner in which they filled the seats. Hourigan became suspicious when the men in the automobile did not move from the stop sign and appeared to "stare" at him. He activated the Mars lights and instructed the men to turn off the automobile and put their hands up. Hourigan called for backup and did nothing until another officer arrived.

Based on these facts, we determine that the *Terry* stop was justified. Admittedly, the description of the suspect was general and the officer's estimate of the height of the men in the vehicle was uncertain since they were seated. Further, the conflicting testimony concerning the amount of time that passed between Officer Hourigan's first observation of the vehicle and the stop detracts from the credibility of his statement that the men were "staring" at him for 30 seconds. Nevertheless, Officer Hourigan was able to observe the clothing of the men and estimate their ages, height, and weight. As in *Starks*, the defendant's vehicle was observed in close proximity to the Amoco station within minutes after the robbery was reported. It is well established that a reasonable suspicion supporting an investigatory stop can be derived, in part, from observing suspects similar to those believed to be fleeing from a recent crime when the suspects are located in the general area where fleeing suspects would be expected to be found, given the time and distance from the crime scene. (*People v. Lippert* (1982), 89 Ill. 2d 171, 180-81; *Perez*, 249 Ill. App. 3d at 917; *Starks*, 190 Ill. App. 3d at 507-08.) Based on the description of the suspect and the proximity of the vehicle to the scene of the crime, we determine that the facts and circumstances raised a reasonable articulable suspicion of criminal activity sufficient to justify the *Terry* stop.

Even if the stop was proper, the defendant contends that the subsequent arrest was without probable cause and consequently invalid. Probable cause to arrest was furnished when Officer Hourigan observed marijuana in the vehicle. However, the defendant asserts that he was arrested when he was handcuffed and placed in the squad car because he was not free to leave. It is the defendant's contention that the arrest occurred prior to the time Officer Hourigan observed the marijuana.

■ First, the evidence is not manifest that the defendant was read *Miranda* warnings prior to the time Officer Hourigan observed marijuana in the vehicle. Sergeant Chalupa testified that he read *Miranda* warnings after all the suspects were placed in the squad cars. The defendant states in his brief that "he seems to have done this immediately." The party challenging the validity of a search and seizure bears the burden of proving it was unlawful. (*People v. Martin* (1984), 121 Ill. App. 3d 196, 205.) We determine that the defendant failed to sustain his burden of proving that Sergeant Chalupa's actions preceded Officer Hourigan's initial observation of the marijuana on the seat of the vehicle.

Second, we do not believe the evidence is manifest that the police officers' actions in handcuffing the suspects and placing them in squad

cars constituted an arrest. In general, the drawing of a police officer's weapon, the tone of voice, the use of handcuffs, physical touching, and the threatening presence of several officers are factors which indicate the effectuation of an arrest. (*People v. Dyer* (1986), 141 Ill. App. 3d 326, 332.) However, not all circumstances of handcuffing and detention convert a lawful *Terry* stop into a formal arrest. See *People v. Bujdud* (1988), 177 Ill. App. 3d 396, 402; *People v. Paskins* (1987), 154 Ill. App. 3d 417, 422-23; *Martin*, 121 Ill. App. 3d at 206.

In *People v. Paskins*, suspects in a burglary were stopped by a State trooper because they matched a description given by a radio dispatcher. With his gun drawn, the trooper ordered the suspects to lie face down on the road. When backup arrived, the suspects were subjected to a pat-down search which revealed a hard bulge in the defendant's pocket. The officer reached inside and found a clump of jewelry. Both men were handcuffed. In upholding the denial of the motion to suppress, the court recognized that a *Terry* stop may be accompanied by force which is reasonably necessary to protect the officer. Since the facts of each case differ, the court opined that the permissible bounds of an investigatory stop must be flexible enough to take the least intrusive measures necessary within the dictates of reasonable prudence to maintain the status quo. (*Paskins*, 154 Ill. App. 3d at 422-23.) As stated in *Starks*, "[i]t would be paradoxical to give police the authority to detain pursuant to an investigatory stop yet deny them the use of force that may be necessary to effectuate the detention." (*Starks*, 190 Ill. App. 3d at 509.) Therefore, the difference between an investigatory stop and an arrest does not necessarily lie in the initial restraint of movement. Rather, it lies in the length of time the suspect is detained and the nature and scope of the investigation which follows the initial stop. If the officer's suspicions are not allayed within a reasonable time, the suspect must be allowed to leave or an arrest must be made. *People v. Smith* (1991), 208 Ill. App. 3d 44, 49-50.

In *Michigan v. Long* (1983), 463 U.S. 1032, 77 L. Ed. 2d 1201, 103 S. Ct. 3469, police officers observed the defendant drive his automobile into a ditch. The defendant vacated the automobile. When the defendant began to walk toward the open door of his vehicle, presumably to produce his license and registration, the police officers followed him and observed a hunting knife on the floor of the vehicle. The officers subjected the defendant to a pat-down search but did not recover any weapons. One of the officers shined a flashlight into the automobile and observed something protruding from the armrest. Upon lifting the armrest, the officer discovered a pouch containing marijuana. A further search of the vehicle revealed 750 pounds of

marijuana in the trunk. The defendant's motion to suppress the evidence and quash his arrest was denied.

The Supreme Court upheld the validity of the search, reasoning that a search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief the suspect is dangerous and may gain immediate control of weapons. (*Long*, 463 U.S. at 1050-51, 77 L. Ed. 2d at 1220-21, 103 S. Ct. at 3481.) Although a suspect is under the control of the police during a *Terry* investigation, he could be permitted to reenter the vehicle and gain access to weapons. The hazardous nature of such roadside encounters between suspects and the police was an important factor in justifying the search of the automobile.

In this case, Officer Hourigan was investigating an armed robbery. Thus, it was reasonable to conclude that the suspects in the automobile were armed and dangerous. As in *Paskins*, each suspect was patted down, handcuffed, and placed in a squad car as a reasonable precaution for the officers' safety. Contrary to *Long*, the police officers did not risk that one of the men would reenter the vehicle to retrieve a weapon once they were handcuffed. However, no weapons were recovered in the pat-down search. Since Officer Hourigan first observed the three males in the front seat, and the car had bucket seats, it was reasonable to conclude that another person could possibly be hiding in the back seat who was armed with a weapon. Thus, Hourigan acted pursuant to his authority to search for weapons in a *Terry* stop by approaching the vehicle to ascertain whether there was another person in the back seat. See *Martin*, 121 Ill. App. 3d at 206-07.

When Hourigan approached the vehicle, he observed marijuana on the front seat of the automobile. Since the marijuana was observed in plain view, Hourigan had probable cause to seize the contraband and place the suspects under arrest. (*Martin*, 121 Ill. App. 3d at 207.) Thus, the police officers were justified in conducting a further search of the vehicle incident to the arrest, including containers the police reasonably believed might contain contraband. *People v. Schrems* (1992), 224 Ill. App. 3d 988, 998.

A trial court's ruling on a motion to suppress evidence will not be reversed unless it is manifestly erroneous. (*People v. Galvin* (1989), 127 Ill. 2d 153, 162; *People v. Thomas* (1990), 199 Ill. App. 3d 79, 93.) Since the ski mask and handgun were recovered as a result of a warrantless search incident to a valid arrest, we determine that the trial court's decision to deny the motion to suppress was not manifestly erroneous.

For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County.

Affirmed.

INGLIS, P.J., and GEIGER, J., concur.