THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DWAYNE JACKSON, Defendant-Appellant.

First District (1st Division)   No. 1—01—3551

Opinion filed May 17, 2004.

Michael J. Pelletier and Deborah Israel, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, John E. Nowak, and Allison Maclellan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McBRIDE delivered the opinion of the court:

A jury convicted defendant Dwayne Jackson of burglary. He was sentenced to four years' imprisonment. He appeals, claiming that (1) the evidence was insufficient to support his conviction; (2) the

identification testimony of two witnesses should have been suppressed because it resulted from his illegal detention and an unnecessarily suggestive one-man showup; (3) the jury was erroneously instructed regarding identification evidence; and (4) the trial court erred in failing to investigate his posttrial claims of ineffective assistance of trial counsel.

At trial, Daniel Burnham testified that in July 1999, he was a clerk at Ben's Liquor store, located at 15 East Ohio. The 15 East Ohio building also houses the Ohio East Hotel. The liquor store had two entrances: "[o]ne opening to the street, [and] one opening to the vestibule of the [Ohio East] hotel." There were 12 windows in the front of the store. Each one had a neon sign in it that "pretty much [took] up the whole window." In the vestibule area between the liquor store's two doors, there was no light fixture. However, there were some lighted signs surrounding the door. Those signs remained lighted when the store was closed. There were also "plenty of signs on both doors," none of which were illuminated.

On July 8, Burnham's shift started at 7 a.m., but he did not arrive until 8 a.m. At that time, he noticed that the "window was broken in and there was paper scattered all over the place." Inside the store, "[t]here was a cigar box that had some phone cards in it that were—was on the floor, open and it was a bunch of papers scattered, and [Burnham] noticed some cigarettes missing and stuff, and that's it. It looked like [the store] had been broken into." Some phone cards and about 10 cartons of cigarettes were missing. Burnham started to clean up, but when he learned that Scott Robinson, a resident of the Ohio East Hotel whom Burnham had known for a couple of years, called the police, Burnham stopped cleaning. The police came, took fingerprints, looked around, and "started doing reports." Burnham spoke with the police. After they left, Burnham worked the rest of the day.

Burnham also worked on July 23. That morning after speaking with Ebert Olson, a clerk from the Ohio East Hotel, Burnham called the police and told them that "the guy that broke into the store is out front." The police came. Burnham did not know Jackson and had not seen him around the neighborhood before the burglary. To Burnham's knowledge Jackson was not a frequent customer at the liquor store.

Olson testified that in July 1999, he was employed as a desk clerk at the Ohio East Hotel, a single-residency dwelling, which was different from the Tokyo Hotel.[1] Olson's desk was located in the lobby of

---

[1]As noted later, Officer Lanando inaccurately referred to the Tokyo Hotel at the motion to quash arrest and suppress evidence.

the hotel. A bar was off to the left side of the lobby, and the liquor store was off to the right. There was an entrance to the liquor store from the vestibule of the hotel. Olson explained that one of his duties was to keep people "from hanging around the vestibule, the lobby and the front of the hotel."

Olson was working at 7:15 a.m. on July 8, when he noticed Jackson "hanging in the vestibule." Olson thought Jackson had "a white plastic bag" in his hands. Olson recognized Jackson from seeing him many times in the neighborhood, but he did not know Jackson. Olson went out and told Jackson "he couldn't hang out there." Jackson left. Olson went back behind his desk and sat there for 10 or 15 minutes. Then, he walked to the front entrance "just to look around." He saw Jackson sitting on a fire hydrant that protruded from the building. Olson did not see anyone else in the area at the time, and he returned to his desk.

A few minutes later, Olson saw Robinson, who was a tenant in the hotel. Robinson went toward the side entrance to the liquor store. The store was closed. Robinson and Olson talked for a few minutes. Then, Robinson went back upstairs. When Robinson returned, he entered the lobby from outside and had a "[l]imited conversation" with Olson. Olson did not let Robinson use the phone at that time. About 20 or 30 minutes passed between the time Olson saw Jackson sitting on the fire hydrant and the time Robinson returned to the lobby. Olson never saw Jackson in the liquor store. Olson did not recall talking to any police officers on July 8. He did not remember any police officers in the liquor store or in the hotel lobby. Olson did, however, discuss with Robinson what Robinson had seen on July 8.

On July 23, Olson started work at 7 a.m. At 7:30 a.m., he went outside and saw Jackson "in front of the hotel." Jackson was wearing "dark clothes," and he had a bucket. The clothes Jackson had been wearing on July 8 were "fairly darker" than the clothes he was wearing on July 23. Olson went and told Burnham, who was working in the liquor store, that "this was the guy that they claim was in the store." Olson did not give Burnham "a clothing description of the guy." He did, however, point the individual out and tell Burnham that he was walking west. Burnham called the police. After they arrived, the police brought Jackson into the lobby. Olson did not recall the police talking to him about what happened on July 8 before they brought Jackson into the hotel. Olson did not remember telling the police that the man who committed the burglary was walking down the street. Olson did not remember giving the police a description or having any conversations with the police. Olson did not remember telling the police that Jackson was the man he had seen in the

vestibule two weeks earlier. Olson could not be certain that he had ever talked to the police about what he saw on July 8.

Robinson testified that on July 8, 1999, he was living at the Ohio East Hotel. At 7:30 that morning, he went downstairs to get a pack of cigarettes from the liquor store. The liquor store was not open. Robinson went outside and started smoking a cigarette. Outside, he saw that a window at the base of the store was broken. He looked through the window and "saw some guy rummaging behind the counter." At that time, he could only see "a head or something moving around." He could not see the person clearly and thought it might be Burnham. Robinson "went up to the door on the inside." He knocked on the glass door. The man inside the store walked up to Robinson, "like face to face," and said "we're closed because we've been robbed." The man spoke to Robinson "[j]ust real quick," but Robinson said he could see the man's face, "no ifs, ands, or buts about it." Robinson had never seen the man before. Robinson went inside the hotel and told Olson to call the police. Olson told Robinson to call the police. Robinson called the police. Robinson went back outside, but "the guy had already fled." Robinson told Burnham that the store had been robbed, but he did not tell Olson what he saw. Then, Robinson went back upstairs.

Robinson spoke with police officers on July 8 and gave them a description of the man he had seen inside the liquor store. Robinson thought he told the police that the man inside the liquor store "was a skinny, black dude." He also told the police that the man was wearing "something grayish *** like a gray T-shirt or something like that." He told them the man was around 140 pounds, around "30-ish, 35-ish." He told them the man was shorter than he was at 5 feet 11 inches. He might have said the man was "about average height, maybe a little shorter, like maybe five ten, five nine." Robinson could not remember whether he told the police the man had a medium or light complexion.

At about 7:30 a.m., on July 23, 1999, Robinson came downstairs to get cigarettes. He "just got off the elevator [and said] there's the guy that robbed the liquor store." The "guy" was Jackson. Jackson was in the hotel lobby with another person. Robinson did not know who that other person was. After Robinson indicated that Jackson was the one who had robbed the store, he realized the other person was a police officer. Robinson gave a statement to a detective.

Officer Michael Landando testified that on July 23, he was working in plainclothes with his partner, Officer Bill Walsh. At about 7:30 a.m., they received "a call of a man wanted for a robbery." They responded to 15 East Ohio, where they spoke with Olson "about the things that had caused him to make the call." Olson gave Landando a description of the individual he had seen and described the direction

in which the individual was proceeding. Landando and Walsh "had observed an individual walking westbound from that location when [they] initially pulled up in front of the hotel." They saw Jackson, who matched the description given by Olson, walking westbound. Jackson had a white bucket with him, but he did not have anything from the liquor store. Landando thought Jackson was wearing a blue windbreaker. Landando and Walsh took Jackson into custody by putting his hands behind his back and handcuffing him. Then, they put him in their squad car and drove him back to the hotel to see if Olson could positively identify him. At that time, Robinson entered the lobby and said "that's the guy who robbed the liquor store." The officers escorted Jackson back to their squad car. Then, they took information from Olson and Robinson. They transported Jackson to the 18th District police station, where they advised him of his *Miranda* rights. Jackson told the officers that on July 8, "he was in the area there but he did not commit the burglary."

Officer Drew Poynter testified for the defense that on July 8, he was working in uniform in a marked squad car with his partner Jim Dolan. Between 8:30 and 9 a.m., that morning, he went to Ben's Liquor Store at 15 East Ohio. Poynter noticed a broken window when he arrived at the liquor store. Poynter spoke with Robinson on the sidewalk in front of the store. Robinson described the offender as wearing gray slacks, dark clothing. He further described the offender as a light-complected black male with a beard, 5 feet 11 inches tall, between 25 and 35 years old.

Officer Walsh testified that on July 23, 1999, he was working in plainclothes with Landando. At about 7:30 a.m., they went to 15 East Ohio, where they spoke with Olson. They did not speak with anyone in the liquor store at that time. "Minutes later," the officers took Jackson into custody. The officers returned to 15 East Ohio with Jackson. Robinson was in the hotel lobby at that time. When Walsh claimed he could not remember whether there were other officers in the hotel lobby while he and Landando were there with Jackson, he was confronted with his testimony from a prior hearing, during which he stated that he, Landando, and "two other plainclothes officers that arrived on the scene" were with Jackson in the hotel lobby. Walsh did not speak with anyone in the lobby. A little later, Walsh and Landando took Jackson to the police station. At the station, Jackson informed Walsh that he was 5 feet 7 inches tall.

Officer Gregory Horkavy testified that in July 1999, he was employed by the Chicago police department as an evidence technician. On July 8, 1999, he was assigned to work at Ben's Liquor store at 15 East Ohio. He arrived at the location at about 9 a.m. There were no

other police officers at the scene at that time. Horkavy spoke with Burnham and Robinson inside the liquor store. Horkavy first noticed that about 98% of the second window from the right on the front of the window was broken out of the frame. Horkavy checked the glass and window frame for ridge impressions. Horkavy did not find any ridge impressions on the frame, but he did find some on glass fragments inside the store. The impressions were not complete. Horkavy also checked for prints at the counter and the cigarette area, but did not find prints in either location. Horkavy did not take any photographs at the scene. Horkavy did not take any elimination prints either.

The parties stipulated that Officer Kovax of the Chicago police crime lab compared the prints lifted by Horkavy with Jackson's prints and "found that there were insufficient points to make an identification on the prints that were lifted by Officer Horkavy at the scene of the crime." The jury found Jackson guilty of burglary.

On June 22, 2001, during posttrial proceedings, the trial court informed the parties that on May 22, a female juror "expressed that she had some concern with the verdict." She indicated, however, "that she did deliberate with her fellow jurors." The trial court also presented the attorneys with a copy of a letter written by another juror. In the letter, the juror indicated that he was "not quite sure justice was really accomplished" in Jackson's case. The trial court sentenced Jackson to four years' imprisonment.

We first consider Jackson's claim that the trial court improperly admitted the July 23 identifications by Olson and Robinson. Jackson filed a pretrial motion to quash his arrest and suppress the identifications. Another judge presided over that hearing. At the hearing, Landando testified that on July 23, 1999, he was assigned to the tactical unit with Walsh. He was working in plainclothes, driving an unmarked vehicle. At 7:30 a.m., Landando saw Jackson half a block west of 15 East Ohio. Landando did not have a warrant to search or arrest Jackson at that time. Jackson was not breaking any laws. Landando "detained" Jackson and took him to the Tokyo Hotel at 15 East Ohio. At the hotel, Jackson was identified by Olson and Robinson. Jackson was then transported to the 18th District police station. At the station, Jackson was questioned about a burglary that occurred on July 8. Jackson supplied the police with his whereabouts on that day.

On cross-examination, Landando explained that he was called to the Tokyo Hotel on July 23 because "there was a man wanted for a robbery at that location." As they approached the hotel, Landando saw Jackson walking westbound on the street, but he "didn't know at that point that [Jackson] was the guy." When he arrived at the hotel,

Landando spoke with Olson, the hotel clerk. "[Olson] said that the guy who committed a burglary a couple weeks ago in the liquor store, which is adjacent to the Tokyo Hotel there, was just in the lobby and he just walked out the door and he was walking westbound on Ohio." Olson described the man and his clothing. Landando exited the hotel and "arrested" Jackson. When he brought Jackson into the hotel, Robinson said "on the day of the burglary, \*\*\* he observed [Jackson] inside the liquor store." That day, Robinson asked Jackson "what was going on," and Jackson responded, "we're closed. We just got robbed." Robinson told Landando that he did not know Jackson's name, but that he had seen him previously "in and around the Tokyo Hotel." He had also seen Jackson in the liquor store on other occasions.

Landando stated that both Olson and Robinson identified Jackson as the person who had burglarized the liquor store. However, he conceded that Olson had not seen Jackson inside the liquor store on the day of the burglary. Olson did not see Jackson take anything from the liquor store or break a window of the liquor store. Instead, Olson had seen Jackson loitering in the hotel and told him not to loiter in the hotel. Jackson told Olson that he was waiting for the liquor store to open. Then, Olson saw Jackson loitering outside the front of the liquor store just prior to the burglary.

On redirect examination, Landando explained that when he took Jackson from the street into the hotel to be identified on July 23, he did not have "any independent information that [Jackson] was wanted for burglary." He did not have any further description, such as clothing, height, weight, from Olson regarding who was wanted in the burglary. According to Landando, Jackson was already in custody when Robinson saw him at the hotel.

On re-cross-examination, Landando testified that Olson told him that, on the date of the burglary, Olson and Robinson had a conversation regarding the burglary. During that conversation, Robinson told Olson "who he had seen at the time of the burglary inside the store."

In denying the motion to quash arrest and suppress evidence, the judge presiding over the hearing made the following remarks:

"Let's proceed with the version presented by the petitioner that in fact the officer only had a statement from Mr. Olson that the individual he had just seen in the hotel and was now walking down Ohio Street was wanted for a burglary. Without anything more, that is still, in my judgment, sufficient to allow the police officer to make a stop of the defendant. And although the officer indicated that it was an arrest of the defendant—whether or not an arrest occurred is a question of law, and my judgment is that it was simply a—the defendant was simply detained and that it wasn't a full-

blown arrest; that he was detained to confirm or follow up the information that the officers had received from the clerk, Mr. Olson. So they brought him back to the hotel to develop further the accusations by that clerk."

The fourth amendment generally protects citizens from warrantless searches and seizures that are not supported by probable cause. *People v. Sorenson*, 196 Ill. 2d 425, 432 (2001). "A seizure occurs when the police, by means of physical force or show of authority, have in some way restrained the person's liberty." *People v. Perkins*, 338 Ill. App. 3d 662, 666 (2003). A defendant challenging a seizure on fourth amendment grounds bears the burden of making "a *prima facie* case that the police lacked probable cause, lacked reasonable grounds to arrest the defendant, or had no reasonable or articulable suspicion of criminal activity that would warrant an investigative stop." *People v. Culbertson*, 305 Ill. App. 3d 1015, 1023 (1999). In reviewing a trial court's denial of a motion to suppress evidence based on lack of probable cause or reasonable suspicion, we "accord great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence; however, we *** review *de novo* the ultimate question of the defendant's legal challenge to the denial of his motion to suppress." *Sorenson*, 196 Ill. 2d at 431; see also *People v. Brown*, 343 Ill. App. 3d 617, 621 (2003); *People v. Delaware*, 314 Ill. App. 3d 363, 367 (2000).

Jackson claims that the police lacked probable cause to arrest him on the street outside the hotel on July 23. Probable cause to arrest exists when "the police [have] knowledge of facts which would lead a reasonable person to find that a crime has occurred and that it has been committed by the defendant." *People v. Bramlett*, 341 Ill. App. 3d 638, 649 (2003). The determination of probable cause is an objective, case-by-case determination that is based on the totality of the circumstances. *People v. Brannon*, 308 Ill. App. 3d 501, 505 (1999).

The State concedes that Officers Landando and Walsh did not have probable cause to arrest Jackson until Robinson identified him as the man he saw inside the liquor store on the day of the burglary. It maintains, however, that Jackson was not arrested until after he was identified by Robinson. It claims that the initial stop of Jackson and his transport back to the hotel were part of a proper investigatory detention under *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868. The trial court held as much, finding that Jackson was not arrested when he was stopped and transported for the showup and that Jackson was justifiably detained "to confirm or follow up the information that the officers received" from Olson and "to develop further the accusations" made by Olson. Jackson disagrees with the State and the

trial court; he claims that he was arrested when he was stopped on the street, handcuffed, and transported to the hotel for identification.

■ "An arrest is said to occur where a person's freedom of movement has been restrained by physical force or a show of authority." *Delaware*, 314 Ill. App. 3d at 370. To determine whether an arrest occurred in a particular case, we consider the totality of the circumstances and ask "whether a reasonable person, innocent of any crime, would have believed that he was not free to leave." *People v. Williams*, 303 Ill. App. 3d 33, 40 (1999). The factors we consider include: (1) the time, place, length, mood and mode of the encounter between the defendant and the police; (2) the number of police officers present; (3) any indicia of formal arrest or restraint, such as the use of handcuffs or drawing of guns; (4) the intention of the officers; (5) the subjective belief or understanding of the defendant; (6) whether defendant was told he could refuse to accompany police; (7) whether the defendant was transported in a police car; (8) whether the defendant was told he was free to leave; (9) whether the defendant was told he was under arrest; and (10) the language used by officers. See *People v. Willis*, 344 Ill. App. 3d 868, 875 (2003); *Delaware*, 314 Ill. App. 3d at 370; *Williams*, 303 Ill. App. 3d at 40; *People v. Wallace*, 299 Ill. App. 3d 9, 17-18 (1998); *People v. Lenius*, 293 Ill. App. 3d 519, 534-35 (1997).

■ In this case, the evidence shows that Landando and Walsh confronted Jackson as he walked down a public street during morning hours. When Landando and Walsh first encountered Jackson, they were the only two officers in the area. However, it appears that there were four officers present with Jackson at the hotel. When the officers stopped Jackson on the street, they handcuffed him. Then, they transported him in a police car and escorted him inside the hotel. At least one officer stood next to him inside the hotel. There is little to no evidence as to what the officers said to Jackson when they stopped him; however, Landando testified that he "arrested" Jackson on the street and that Jackson was in custody at that time. There is no indication that either of the officers asked Jackson to accompany them anywhere, told him he was free to leave, or told him that he could refuse to accompany them. Instead, the evidence shows that the officers handcuffed Jackson, placed him in their squad car, and transported him to the hotel. Although the evidence does not show whether Jackson was told he was under arrest, he was handcuffed and transported in a police car by officers, one of whom later claimed that Jackson was arrested and in custody at that time. Under the circumstances, it would have been reasonable for Jackson to conclude that he was not free to leave. Further, although we do not know the officers' intent in stopping Jackson, their actions at the time of the

stop and Landando's subsequent description of their action as an arrest indicates that they intended to arrest him. Based upon the above examination, we conclude that the trial court's finding that Jackson was not arrested was manifestly erroneous and contrary to the facts presented. In any event, we find that at the time Jackson was stopped, Officers Landando and Walsh did not have the reasonable suspicion required to justify an investigatory stop. Further, we also find that the officers acted unreasonably in transporting Jackson to the hotel for identification two weeks after the offense occurred.

■ An officer is entitled to make a brief investigatory stop without a warrant and without probable cause "if the officer reasonably believes that the person has committed, or is about to commit, a crime." *People v. Cox*, 202 Ill. 2d 462, 466 (2002); *Terry v. Ohio*, 392 U.S. 1, 22, 20 L. Ed. 2d 889, 906-07, 88 S. Ct. 1868, 1880 (1968). The stop must be based upon more than a mere hunch or suspicion. *People v. Sparks*, 315 Ill. App. 3d 786, 792 (2000) ("To initiate an investigatory stop, an officer must articulate something more than an inchoate and unparticularized suspicion or hunch"); *People v. Messamore*, 245 Ill. App. 3d 627, 629 (1993) ("'[A] mere suspicion or hunch is insufficient to warrant a stop"); *People v. Watson*, 145 Ill. App. 3d 492, 496 (1986). The officer must be able "to point to specific and articulable facts which, taken together with rational inferences therefrom, reasonably warrant that intrusion." *Cox*, 202 Ill. 2d at 467; *Terry*, 392 U.S. at 20-21, 20 L. Ed. 2d at 905-06, 88 S. Ct. at 1879-80.

We apply the same totality of the circumstances approach for determining reasonable suspicion under *Terry* as we do for determining the existence of probable cause to arrest; however, we make an allowance for the lesser showing required to meet the reasonable suspicion standard. *People v. Ertl*, 292 Ill. App. 3d 863, 869 (1997). This requires us to objectively consider whether the information known to the officer at the time of the stop " 'would warrant a person of reasonable caution to believe a stop was necessary to investigate the possibility of criminal activity.' " *Delaware*, 314 Ill. App. 3d at 368, quoting *People v. Walters*, 256 Ill. App. 3d 231, 234 (1994). We first ask whether the officer's action was justified at its inception. Then, we consider whether the officer's action was reasonably related in scope to the circumstances which justified the interference. *Delaware*, 314 Ill. App. 3d at 368; *Terry*, 392 U.S. at 19-20, 20 L. Ed. 2d at 905, 88 S. Ct. at 1879.

■ An officer may act on information provided by a third party in making a *Terry* stop, but only if the information provided is reliable and allows an officer to reasonably infer that a person was involved in criminal activity. *People v. Lockhart*, 311 Ill. App. 3d 358, 362 (2000).

The source of the information may be identified or unidentified, an ordinary citizen or a paid informant. The source may be a victim, an eyewitness, or other witness. "[I]t matters not by what name the informant is labelled; we look rather to the informant's reliability as only one of the factors to be considered in the totality of the circumstances approach." *People v. Adams*, 131 Ill. 2d 387, 397 (1989). The third party's information "must bear some indicia of reliability and must be sufficient to establish the requisite quantum of suspicion." *Brown*, 343 Ill. App. 3d at 623. As the court explained in *In re J.J.*, 183 Ill. App. 3d 381, 385-86 (1989):

> "[T]ips may vary greatly in their value and reliability and *** one simple rule will not cover every situation. Where some tips, completely lacking in indicia of reliability, would warrant either no police response or require further investigation before a stop would be justified, other situations, such as when a victim of a crime seeks immediate police aid and describes his assailant or when a credible informant warns of a specific impending crime, would justify the police making an appropriate response." *In re J.J.*, 183 Ill. App. 3d at 385-86, discussing *Adams v. Williams*, 407 U.S. 143, 147, 32 L. Ed. 2d 612, 617-18, 92 S. Ct. 1921, 1924 (1972).

This case falls somewhere in the middle of that spectrum. Thus, we must examine the totality of the circumstances to determine whether the information provided by Olson had "a degree of reliability, of quality, and of sufficiency that will sustain a finding of a reasonable and articulable suspicion for the stop." *Ertl*, 292 Ill. App. 3d at 869. This requires us to "consider the informant's veracity, reliability, and basis of knowledge." *Sparks*, 315 Ill. App. 3d at 792.

In evaluating the reliability of a third party's information, we may give greater weight to information provided by an eyewitness or victim of the crime. *Ertl*, 292 Ill. App. 3d at 873. However, "the mere fact that a citizen is identified will not automatically impart credibility and reliability to his statement." *Ertl*, 292 Ill. App. 3d at 873. In fact, our supreme court has rejected any presumption that information provided by a citizen informant is more reliable than information provided by paid informants. *Adams*, 131 Ill. 2d at 398. And, even "when information comes from a named witness, it remains [the] case that a minimum of corroboration or other verification of the reliability of the information is required." *Village of Mundelein v. Thompson*, 341 Ill. App. 3d 842, 851 (2003); see also *People v. Wilson*, 260 Ill. App. 3d 364, 370 (1994) (seizure was not justified where police had information, which they failed to corroborate, from the victim's daughter, whose basis of knowledge was unknown and who was not an eyewitness to or victim of the crime). Thus, regardless of the third party's status as a

witness or victim, we consider the totality of the circumstances surrounding the information provided by that party, paying specific attention to the basis of knowledge and the veracity of the provider of the information. *People v. Yarber*, 279 Ill. App. 3d 519, 526 (1996). We also keep in mind that the information must be reliable "in its assertion of illegality, not just in its tendency to identify a determinate person." *Sparks*, 315 Ill. App. 3d at 794. "Reliability as to identification must not be confused with reliability as to the likelihood of criminal activity." *Brown*, 343 Ill. App. 3d at 626. In other words, the source must provide "more than 'innocent' details of a suspect." *Sparks*, 315 Ill. App. 3d at 794.

If the third party's information does not have "some indicia of reliability," police are not justified in relying on it as the basis for a *Terry* stop unless they "conduct additional investigation to verify the information." *Sparks*, 315 Ill. App. 3d at 793. "The goal of corroboration is to reduce the chance of acting on a ' "reckless or prevaricating tale' " and establish a basis for crediting the tip. [Citations.]" *Brannon*, 308 Ill. App. 3d at 506. Without sufficient verification or corroboration, it is possible that police are acting on a malicious prank initiated at the defendant's expense. *Ertl*, 292 Ill. App. 3d at 872. Thus, where the information provided to the police cannot be easily corroborated and there are no other suspicious circumstances known to the police, a stop may not be warranted. *Ertl*, 292 Ill. App. 3d at 869. Similarly, where the information lacks sufficient detail and the informant does not claim to have witnessed any criminal activity, the information is not reliable without corroboration and a stop may not be warranted. See *Lockhart*, 311 Ill. App. 3d at 362; *Sparks*, 315 Ill. App. 3d at 794-95.

In *Ertl*, the defendant was stopped near his wife's house after his wife called police and reported that her soon-to-be ex-husband was at her house " 'hammering' " on her door because he wanted his mail. She claimed that he had threatened her in the past and had kept loaded guns beside his bed and inside his car while they were living together. *Ertl*, 292 Ill. App. 3d at 865. The defendant's wife also reported that the defendant was driving a black Dodge Ram with the license plate number CFIII1. *Ertl*, 292 Ill. App. 3d at 865. The court affirmed the trial court's order quashing the defendant's arrest and suppressing evidence, holding that the wife's call did not justify a *Terry* stop because (1) the wife's information "was based on limited and somewhat speculative observations and consisted largely of [her] subjective fears"; (2) the wife did not witness the defendant commit any criminal act and could not predict that he was going to do so; (3) the police only corroborated "innocent" details of the wife's tip, includ-

ing the description of the defendant's vehicle and its location; (4) the officers did not observe defendant engage in any unlawful or threatening behavior before they stopped him; and (5) although "there were several officers" available to go to the wife's location and verify the information she provided, they did not do so. *Ertl*, 292 Ill. App. 3d at 873-74.

In *Yarber*, the defendant was stopped based on an anonymous Crimestoppers tip from a woman who claimed that her best friends regularly purchased cannabis from the defendant and the defendant sold cannabis at parties. *Yarber*, 279 Ill. App. 3d at 522. "The [anonymous caller] provided Yarber's general physical description (race, height, and weight), provided his dormitory address at Southern Illinois University, and indicated that he lived alone at that address and that he worked at the Lentz Hall cafeteria." *Yarber*, 279 Ill. App. 3d at 522. Four hours later, the woman called back and said that the defendant was going to board an Amtrak train for Chicago on that day, with the purpose of purchasing cannabis, and return the following day. *Yarber*, 279 Ill. App. 3d at 522. Before stopping the defendant, the police confirmed "his general height, weight, race, employment, and residential address," but were "unable to independently verify any of the informant's allegations of criminal activity." *Yarber*, 279 Ill. App. 3d at 528. The court affirmed the trial court's suppression of evidence finding that the *Terry* stop was not justified because (1) "nothing about the tip established the informant's basis of knowledge"; (2) the caller "did not indicate that she witnessed any criminal activity"; (3) the tip "contained only hearsay reports of other individuals"; (4) the caller had not previously supplied reliable information to the police; and (5) at the time they stopped the defendant, the police had only corroborated "innocent details" contained in the tip. *Yarber*, 279 Ill. App. 3d at 528.

The information Olson provided to police and the police officers' subsequent actions did not justify the stop in this case. Importantly, nothing in Olson's statements to police established a reliable basis for his information. According to Landando, Olson called the police and stated that "there was a man wanted for a robbery at that location." However, Olson did not witness Jackson perform any criminal act. Instead, the basis of his information was the unconfirmed hearsay of Robinson, who may have described the offender to Olson, although Robinson denied giving Olson any such description. The veracity of the information upon which Landando relied is further called into question because Olson denied that he called the police and could not remember talking to them about what he saw on July 8. In fact, Burnham testified that he was the person who called the police on July 23.

Yet, Landando made no mention of speaking with Burnham in an effort to corroborate the information.

In any event, even if the information came from Olson, as Landando claims, the only fact Landando corroborated was an innocent fact, namely, that Jackson was walking westward from the hotel. Landando did not observe Jackson commit any crime or notice anything suspicious about Jackson's behavior. Jackson did not attempt to flee when approached by Landando. Landando admittedly did not have "any independent information that [Jackson] was wanted for a burglary." Landando did not make any effort to determine whether any description of the burglar had been given immediately following the crime, whether that description matched Olson's description of Jackson or Jackson's actual characteristics, or whether there were any eyewitnesses to the burglary who might be able to provide a description of the offender. Furthermore, it is unclear from the record whether Landando even knew that a burglary had occurred at the liquor store two weeks previously. Nevertheless, Landando did not make any attempt to verify that a burglary had occurred at the liquor store. Considering that the liquor store was next door to the hotel and that Landando had radio contact with a police dispatcher, his failure to at least attempt to confirm the information provided by Olson is unreasonable, especially in light of the fact that Olson had no personal knowledge concerning the burglar's identity. Without corroboration, Olson's conclusory information, which was based solely on unconfirmed hearsay, did not justify the officers in stopping Jackson on the street in front of the hotel.

None of the cases cited by the State convince us that Landando and Walsh were justified in stopping Jackson. In *People v. Ross*, 317 Ill. App. 3d 26, 30 (2000), the court upheld a *Terry* stop where the evidence showed that the defendant, a black male wearing a blue shirt, was stopped eight minutes after the victim called police and told them that a black man "wearing a blue shirt had just invaded his home, choked and robbed him, and fled on foot." The defendant was only about one-half block from the victim's house when spotted by police. *Ross*, 317 Ill. App. 3d at 30. The court found that under the circumstances, the facts "provided at least the minimal articulable suspicion required to stop the defendant." *Ross*, 317 Ill. App. 3d at 30. The facts known to Officers Landando and Walsh in this case, however, do not come close to that minimal threshold. Unlike the officers in *Ross*, Landando and Walsh did not have information from a victim of a crime or a description of a fleeing perpetrator immediately following the commission of the crime. Moreover, while they had the opportunity to corroborate Olson's statements by verifying that a burglary had oc-

curred and that the original description of the offender matched Jackson's physical characteristics, they failed to do so. Instead, they acted on an uncorroborated statement from an individual they knew did not witness Jackson commit a crime. Thus, *Ross* is not persuasive.

This case also differs from *People v. Young*, 306 Ill. App. 3d 350, 353-54 (1999), wherein the defendant was apprehended within minutes after police received a phone call from the victim's mother indicating that the victim of an aggravated battery had seen his assailant, defendant, driving a "police style" Chevy outside the victim's home. The defendant was apprehended inside his car within a block of where the victim had seen him. *Young*, 306 Ill. App. 3d at 354. Before stopping the defendant, the "police knew a crime had been committed, namely, aggravated battery with a firearm." *Young*, 306 Ill. App. 3d at 354. They also knew that the victim had been shot by a black male nicknamed "Dre" and that the victim knew his shooter and had gone to school with him. *Young*, 306 Ill. App. 3d at 353.

In this case it does not appear that Landando and Walsh even knew that a crime had been committed at the liquor store two weeks before they received the call from Olson. There is no evidence that the perpetrator of the crime had been identified by name or otherwise prior to Olson's call. Furthermore, although like *Young*, the call police received was not from the victim or eyewitness, the call did not relay the victim's contemporaneous observation of the perpetrator. To the contrary, Olson's claim that Jackson was the burglar was based on information he claims to have received from Robinson two weeks prior to calling the police. Although the contradicted evidence makes it unclear whether Robinson actually described the offender to Olson, even if we credit Olson's claim, the information he provided to police is still significantly less reliable than the information provided in *Young*. Specifically, unlike the victim in *Young*, who went to school with the defendant, Robinson claimed he had not seen the man he saw inside the liquor store on July 8 before. Additionally, there is nothing in the record that provides any details about what Robinson told Olson. Even if we assume that Robinson gave Olson the same description of the offender that he gave police on July 8, that description differed in significant respects from Jackson's actual physical characteristics. For example, Robinson initially described the liquor store burglar as a light-complected black male with a beard, 5 feet 11 inches tall, between the ages of 25 and 35, wearing gray slacks and dark clothing. In fact, Jackson was a medium-complected, 36-year-old, black male, standing 5 feet 7 inches tall. On June 8, Jackson wore a blue windbreaker. Thus, unlike *Young*, the hearsay evidence upon which police acted in this case lacks reliability.

In *People v. Walters*, 256 Ill. App. 3d 231, 235 (1994), the defendant, who matched the description of the perpetrator, was stopped as he fled from the scene of an armed robbery. In upholding the stop, the court emphasized that "the defendant's vehicle was observed in close proximity to the Amoco station within minutes after the robbery was reported." *Walters*, 256 Ill. App. 3d at 236. The court remarked:

"It is well established that a reasonable suspicion supporting an investigatory stop can be derived, in part, from observing suspects similar to those believed to be fleeing from a recent crime when the suspects are located in the general area where fleeing suspects would be expected to be found, given the time and distance from the crime scene." *Walters*, 256 Ill. App. 3d at 236.

Similarly, in *People v. Bujdud*, 177 Ill. App. 3d 396, 402 (1988), the defendant was stopped while in a vehicle that had been "proceeding at an excessive rate of speed away from the vicinity of [a] shooting," of which the officer had knowledge. Moreover, the defendant committed traffic violations sufficient to give cause for the officer to stop his vehicle. *Bujdud*, 177 Ill. App. 3d at 402. Unlike the defendants in *Walters* and *Bujdud*, however, Jackson was not seen fleeing from the scene of a crime near the time the crime occurred. Jackson was seen walking down a public street near a liquor store that had been burglarized two weeks earlier. Jackson was not committing any crime or acting suspiciously. In fact, when Officers Landando and Walsh saw him on their way to the hotel, they observed nothing suspicious about his behavior and had no other reason to stop him.

■ In this case, the information provided to Officers Landando and Walsh was given by Olson, who did not personally witness the crime, two weeks after the crime occurred. Moreover, the source of Olson's information is unclear in light of his statement that Robinson described to him the man Robinson had seen inside the liquor store at the time of the burglary and Robinson's testimony that he made no such statement. Even if Olson's version is to be believed, the information he provided to police was based solely on unconfirmed hearsay. Further, unlike most of the cases discussed above, there is no indication that Landando or Walsh was even aware that a burglary had occurred and they took absolutely no steps to corroborate any of the information provided by Olson other than observing to see if Jackson was walking westbound on Ohio Street. The facts known to Landando and Walsh were conclusory and lacked detail. Indeed, Landando and Walsh were acting on nothing more than an unsubstantiated hunch. Thus, the stop of Jackson was not proper under *Terry*.

Moreover, our courts have repeatedly recognized that the time of

the stop in relation to the time of the crime is a factor that may be considered in determining whether reasonable suspicion existed. See *Walters*, 256 Ill. App. 3d at 236 ("It is well established that a reasonable suspicion supporting an investigatory stop can be derived, in part, from observing suspects similar to those believed to be fleeing from a recent crime when the suspects are located in the general area where fleeing suspects would be expected to be found, given the time and distance from the crime scene"); *People v. Lippert*, 89 Ill. 2d 171, 181 (1982) (important factor in upholding stop and subsequent arrest of defendant was that the defendant was "in the area of the robbery within a short time after its occurrence"); *People v. Byrd*, 47 Ill. App. 3d 804, 808 (1977) ("[T]he general description, combined with the remote time and place of defendant's seizure, compels a finding that the officer's stop of defendant was unreasonable"); *People v. Moorhead*, 17 Ill. App. 3d 521, 528 (1974) (officer's testimony that defendant fit the general description of the offender "combined with the remote time and place of defendant's seizure, do not comport with the standard of specific information which the Supreme Court has required an officer to have before he may lawfully stop an individual on the street"). In this case, the stop occurred two weeks after the burglary and was based upon information provided by a noneyewitness who did not provide any details as to the crime or the description of the offender. Under the circumstances, Olson's and Robinson's identifications of Jackson on July 23 should have been suppressed. See *Perkins*, 338 Ill. App. 3d at 668.

Additionally, even if the initial stop of Jackson was justified, we conclude that the detention and transport of Jackson to the hotel for identification was not justified under *Terry*. See *Perkins*, 338 Ill. App. 3d at 667 ("A *Terry* detention violates fourth amendment search and seizure protections if it is longer than necessary to effectuate the purpose of the stop or if the investigation proceeds beyond the legitimate scope of the stop"). Courts have upheld transportation for identification as a justified part of a *Terry* stop in limited circumstances with the rationale that "a short period of detention was only minimally intrusive when compared to the benefit of immediate investigation." *Lippert*, 89 Ill. 2d at 183. Allowing such identifications " 'fosters the desirable objectives of fresh, accurate identifications which may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing offender while the trail is fresh.' " *People v. McKinley*, 69 Ill. 2d 145, 153 (1977), quoting *People v. Elam*, 50 Ill. 2d 214, 218 (1972). In *Lippert*, for example, the court upheld the two- to three-mile transport of the defendant, who was stopped "no more than 35 minutes after the rob-

bery and very close to the scene of the crime" for prompt identification by the victims as a "legitimate investigatory procedure" even in the absence of probable cause to arrest. *Lippert*, 89 Ill. 2d at 181-82, 184. In this case, however, the transport of Jackson for identification was not part of an immediate investigation. Jackson was not fleeing from the scene of a crime. The officers made no attempt to verify Olson's statement that Jackson was the burglar by confirming that Jackson's physical characteristics matched those initially given of the burglar on the date of the crime. Our research has not revealed any case in which a court has found the transportation of a defendant for identification was justified as part of a *Terry* stop in circumstances like those presented in this case. Thus, even if the initial stop of Jackson was justified, and we do not believe it was, his continued detention and transport to the hotel for identification were not. See *Perkins*, 338 Ill. App. 3d at 668.

Because we have found the July 23 identifications inadmissible as the tainted fruits of Jackson's illegal detention, we need not address Jackson's contention that the suppression of the identifications was also warranted because the showup was unduly suggestive. We point out, however, that one-man showups are generally considered unduly suggestive and are condemned. See *People v. Manion*, 67 Ill. 2d 564, 569 (1977); *People v. Hughes*, 259 Ill. App. 3d 172, 176 (1994); *People v. Follins*, 196 Ill. App. 3d 680, 687 (1990); *People v. Chatman*, 32 Ill. App. 3d 506, 509 (1975); *People v. Wright*, 126 Ill. App. 2d 91, 94 (1970).

■ We next consider whether Robinson's and Olson's in-court identifications of Jackson were tainted by Jackson's improper detention on July 23 and should have been suppressed. The question of whether an in-court identification has an independent basis "arises when an unconstitutional pretrial identification intervenes between the crime and the in-court testimony." *People v. Curtis*, 113 Ill. 2d 136, 147 (1986). In such cases, unless the State proves by clear and convincing evidence based upon the totality of the circumstances "that the witness is identifying defendant based solely on his memory of the events at the time of the crime," the witness's in-court identification is inadmissible because of the taint of the earlier identification. *People v. Smith*, 232 Ill. App. 3d 121, 130 (1992). The factors considered in determining whether the in-court identification is sufficiently independent from the tainted identification to justify its admission include: the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, the length of time

between the crime and the confrontation, any previous identification of another person, any failure by the witness to identify the defendant on a prior occasion, and the witness's acquaintance with the defendant prior to the crime. See *People v. McTush*, 81 Ill. 2d 513, 521 (1980); *People v. Taylor*, 163 Ill. App. 3d 346, 357 (1987); *People v. Hatcher*, 45 Ill. App. 3d 374, 388 (1977). If an evaluation of these factors reveals that the in-court identification is not independent of the tainted evidence, "the defendant is entitled to a new trial free of the tainted testimony, unless that witness' testimony was harmless error beyond a reasonable doubt." *Hatcher*, 45 Ill. App. 3d at 388.

Based on the record in this case, we are unable to determine whether Robinson's and Olson's in-court identifications were sufficiently independent from Jackson's unlawful detention to make them admissible. Thus, we remand this matter and instruct the trial court to conduct a hearing at which time the State will be given the opportunity to prove by clear and convincing evidence that Olson's and Robinson's identifications were based on their memories of the events on July 8, free from the events on July 23. If that hearing reveals that the in-court identifications made by Olson and Robinson were not tainted by Jackson's unlawful detention, those identifications should be admitted on retrial. If, however, the in-court identifications are not independent from the unlawful detention, the in-court identifications should be suppressed. See *People v. Brooks*, 187 Ill. 2d 91, 129 (1999); *People v. Lee*, 44 Ill. 2d 161 (1969); *People v. Blumenshine*, 42 Ill. 2d 508, 513 (1969).

■ Because double jeopardy bars retrial after reversal where the evidence at the first trial was not sufficient to support conviction, we must review Jackson's claim of insufficiency of evidence. *People v. Olivera*, 164 Ill. 2d 382, 393 (1995). In doing so, we ask whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Olivera*, 164 Ill. 2d at 396. We consider all the evidence introduced at the original trial, even if erroneously admitted. *Olivera*, 164 Ill. 2d at 393. Before considering the evidence, however, we note that "[a] positive identification by a single witness, if credible, is sufficient to support a finding or verdict of guilty." *People v. Calhoun*, 132 Ill. App. 2d 665, 668 (1971).

In this case, the evidence at Jackson's first trial was sufficient to support conviction. Olson's testimony and Jackson's statement to police placed Jackson in the vicinity of the crime at the time it occurred. Robinson's testimony placed Jackson inside the liquor store at the time it was burglarized. The evidence further showed that phone cards and cigarettes were missing from the liquor store after Robinson

saw Jackson inside. Without determining Jackson's guilt or innocence, we find merely that the evidence was sufficient to support conviction and retrial is not barred on double jeopardy grounds. See *Taylor*, 163 Ill. App. 3d at 362.

■ Finally, although we need not address Jackson's claim that the jury was improperly instructed regarding identification evidence, we think that in light of the disagreement in this district regarding this issue (compare *People v. Tisley*, 341 Ill. App. 3d 741 (2003), and *People v. Gonzalez*, 326 Ill. App. 3d 629, 635 (2001)), it is deserving of our attention. In this case, a modified version of Illinois Pattern Jury Instructions, Criminal, No. 3.15 (Supp. 2003) (hereinafter IPI Criminal No. 3.15 (Supp. 2003)) was given to the jury as follows:

"When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including but not limited to the following:

The opportunity the witness had to view the offender at the time of the offense, or the witness's degree of attention at the time of the offense, or the witness's earlier description of the offender, or the level of certainty shown by the witness when confronting the defendant, or the length of time between the offense and the identification confrontation."

Jackson claims that use of the word "or" between the factors to be considered by the jury improperly instructed the jury that it could consider any of the five factors in evaluating the identification testimony, instead of considering all of them.

Although we need not decide if error occurred, we simply point out that in the 2003 supplement to the IPI instruction, the committee changed the recommended instruction so that it reads:

"When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following:

[1] The opportunity the witness had to view the offender at the time of the offense.

[2] The witness's degree of attention at the time of the offense.

[3] The witness's earlier description of the offender.

[4] The level of certainty shown by the witness when confronting the defendant.

[5] The length of time between the offense and the identification confrontation." IPI Criminal No. 3.15 (Supp. 2003).

The comments further instruct: "Do not use 'or' or 'and' between the factors." IPI Criminal No. 3.15, Comment 2 (Supp. 2003). This new instruction is in accord with the well-settled principle that there are five factors that should be considered in determining the reliability of identification evidence: (1) the opportunity of the witness to view the

offender at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the offender; (4) the level of certainty demonstrated by the witness upon confronting the defendant; and (5) the time between the commission of the crime and the confrontation with defendant. See *Manson v. Brathwaite*, 432 U.S. 98, 114-15, 53 L. Ed. 2d 140, 154, 97 S. Ct. 2243, 2253 (1977); *Neil v. Biggers*, 409 U.S. 188, 199-200, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382 (1972); *People v. Slim*, 127 Ill. 2d 302, 308 (1989). Thus, should an instruction on identification testimony be necessary on retrial, the instruction should follow the form of the current pattern instruction.

Because we are reversing Jackson's conviction and remanding for a new trial, we need not address Jackson's claim that the trial court erred in failing to inquire into his posttrial allegations of ineffective assistance of counsel.

Reversed and remanded with instructions.

O'MALLEY, P.J., and GORDON, J., concur.