FIRST DIVISION
DECEMBER 15, 2008

No. 1-07-0137

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 00 CR 11338 |
| | ) | |
| DANIEL RODRIGUEZ, | ) | Honorable |
| | ) | Bertina Lampkin, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ROBERT E. GORDON delivered the opinion of the court:

Defendant Daniel Rodriguez was convicted by a jury on September 21, 2005, of the first-degree murder of 18-year-old Ricardo Vasquez. In addition, the jury found that defendant personally discharged the firearm that proximately caused Vasquez's death. The murder was the result of a gang-related, drive-by shooting on April 1, 2000, at approximately 9:30 p.m., in the vicinity of 8707 South Escanaba Street in Chicago. Defendant was sentenced to 45 years of incarceration, which was the minimum available sentence and which included a 25 year enhancement for discharging the firearm that proximately caused the victim's death. On appeal, defendant makes two claims. First, defendant claims that the trial court abused its discretion by giving a portion of Illinois Pattern Jury Instruction, Criminal, No. 3.15 (4th ed. 2000) (IPI Criminal 4th). Defendant claims that social science evidence indicates that part of the instruction is based on a mistaken assumption, namely that an identification is more credible if the

witness is more certain. Second, defendant claims that his trial counsel was ineffective for failing to file a motion to suppress a show-up identification of defendant by two witnesses an hour after the murder.

For the following reasons, we affirm the conviction.

BACKGROUND

Defendant's trial began on September 19, 2005. At trial, eight witnesses testified; and all eight were called by the State. Of the eight, four were witnesses to the shooting: (1) Carlos Luna; (2) Camelia Prado; (3) Joseph Gonzalez; and (4) Antoine Lacy. Francisco Ortiz, an acquaintance of defendant, testified that, on the morning of the shooting, defendant stated that he had "some business" with members of a rival gang because they had damaged his vehicle, the night before. The remaining three witnesses were law enforcement personnel: (1) Officer Edward Maras, an officer with the Chicago police department, who detained defendant after the shooting; (2) Scott Rochowicz, a forensic scientist with the Illinois State Police, who tested gunshot residue recovered from defendant's hands; and (3) Adrienne Segovia, a deputy medical examiner with Cook County, who performed an autopsy on the shooting victim.

Of the four event witnesses, two were able to identify defendant as the shooter: (1) Antoine Lacey; and (2) Joseph Gonzalez. Lacey and Gonzalez identified defendant during a show-up procedure shortly after the shooting. Prado, who was also present at the show-up, was unable to identify defendant.

Carlos Luna testified that he was 25 years old, and that in 2000, he was a member of a gang called the Latin Dragons. On April 1, 2000, he was standing with a few friends in front of a

2

house located at 8707 South Escanaba Avenue. There were approximately 10 people standing in front of the house, and approximately 6 were gang members. The streetlights were on, as well as a porch light. Luna observed a four-door grey Cadillac Seville come from east 87th Street and head west on Escanaba Avenue. Luna approached the vehicle, arriving within 15 feet of it, and the vehicle was traveling slowly. Luna testified that "[t]he driver threw his head back and the passenger opened fire." Luna was unable to observe the passenger's face "[b]ecause of the gun flash." Later that night, when Luna was shown an array of photographs at a police station, he was unable to identify either the driver or the passenger of the vehicle.

Luna further testified that he heard four shots fired. When he heard the first shot, he fell to the ground. Luna identified photographs of: Ricardo Vasquez, the shooting victim; the shooter's vehicle; and the house in front of which Luna was standing. When Luna stood up after the shooting, he saw that Vazquez had been shot.

Camelia Prado testified that she was 29 years old and that in 2000, her aunt lived at 8707 South Escanaba Avenue. At 9:20 p.m., Prado was outside that address with her cousins Anna Rosa and Albert Campos, as well as Carlos Luna, Joseph Gonzalez, Antonio Lacy, Ricardo Vasquez and "other friends." At that time, Prado was a member of the Latin Dragons. Prado was on the porch with her cousin Anna and another cousin and "the kids," while Joseph Gonzalez and Alberto Campos were on the steps. The porch and street lights were on, but the street lights were "like orange" and "dim."

Prado testified that at about 9:20 p.m., a four-door "short-bodied" Cadillac "came off of East 87th Street" on to Escanaba Avenue, and "slowed up in front of [her] aunt's house." Prado

3

watched this vehicle "[b]ecause it's a hot block." Prado explained that when she used the term 'hot block,' she meant "because of the gangs and stuff like that it was always shooting, drive-bys and stuff like that." Prado observed two occupants in the vehicle, a driver and a passenger; and that the driver's window was down.

Prado testified that when the vehicle slowed down, Luna approached it and then "[t]he guy on the passenger side started shooting." The passenger "kind of leaned toward the driver, and we just starting seeing like the fire in front of the driver's face, and the driver threw himself back." Prado heard three or four shots, and "the car kept driving and it crashed into a van that was parked." When the first shots were fired, everyone scattered and Prado hid behind a column on the porch. The victim, Vasquez, "started running towards the corner away from the car" when he was shot. After the vehicle crashed into the van, "[i]t kept going straight up the block to 91st Street and made a left."

Prado testified that she called the police. When the police arrived, she provided a description of the shooter's vehicle. Approximately an hour later, the police returned and asked her to look at a vehicle to "see if it's the car you just saw." Prado went with Antoine Lacy and Joseph Gonzalez to view the vehicle. Prado was able to identify the vehicle as the shooter's vehicle, but she was not able to identify the shooter. On the witness stand, Prado identified photographs of Ricardo Vasquez, her aunt's building and the shooter's vehicle

On cross-examination, Prado denied having told the 911 operator that there were four people in the vehicle. The defense played the 911 tape. On redirect examination, Prado explained that, while she was on the telephone with the 911 operator, someone said to her that there had

4

been four people in the vehicle. Prado repeated that as a question to the person who had stated it. When the 911 operator repeated that statement, Prado first responded "yes" and then responded "no."

Joseph Gonzalez testified that he was a convicted felon, for possession of a handgun. On April 1, 2000, he was "[a]bout 18 maybe." At 9:20 p.m., he was "hanging out" at 8707 South Escanaba Avenue, with a few friends, including Ricardo Vasquez, Camelia Prado, Carlos Luna and Antoine Lacey. Gonzalez was on the first or second step from the bottom, in front of the porch, when he observed a vehicle come "down east 87th ," turn left on to Escanaba Avenue, and slow down. The vehicle "came to like almost a complete stop" in front of the house. Due to the street lights, "east 87th [was] all lit up." The vehicle was a blue, "short-body," four-door vehicle. Gonzalez observed two occupants in the vehicle, a driver and a passenger.

Gonzalez testified that he was watching the vehicle "[b]ecause right where we live at it's a real dangerous block, so any car that comes through you have to pay attention to *** it's a high gang activity area right there." At that time, Gonzalez was a member of the Latin Dragons. Gonzalez tried to look into the vehicle to see "like who the h—, who is that." Gonzalez testified that he could not see the driver, but he could see the passenger, whom he identified in court as defendant. Gonzalez then observed that the passenger "upped a pistol and started shooting," and the driver "leaned back, dude shot right in front of his face pow, pow like that." The passenger fired four or five shots into the crowd in front of and on the porch. After the shots stopped, the vehicle "took off toward the way it was coming, down towards like 91st" and "sideswiped maybe 2 or 3 cars and then it just kept going."

5

Gonzalez testified that after the vehicle departed, he noticed that "Ricardo [Vasquez] didn't get up." Vasquez was "on the ground shaking" and bleeding. After the police and the ambulance arrived, Gonzalez provided a description of both the shooter and his vehicle. Gonzalez testified that he informed the police that the shooter was "[H]ispanic, about my complexion, shaved on the side with longer hair on top." Approximately 10 or 20 minutes later, the police asked him to travel to another location, where he identified both the shooter and his vehicle. The police shined a light on the suspect so that Gonzalez could see the suspect, but the suspect could not see him. Gonzalez testified that defendant's hair was "[s]haved on one side and longer on top." Gonzales testified that "I think it was 3 of us there in the back of the car" during the identification, and that he was certain Camelia Prado was there. At trial, Gonzalez identified photographs of the shooter's vehicle and the scene of the shooting.

On cross-examination, Gonzalez testified that the street light, located in front of the house, shone straight down, over the street. Gonzalez admitted that he lied when he testified in front of the grand jury that he was not a member of a gang. On redirect examination, Gonzalez explained that the light from the street light "fans out." When the vehicle approached, and Gonzalez was on the step, he bent down to see inside the vehicle. Gonzalez testified:

> "Right there when [the vehicle] stopped, you have the [street light]
> pole right there and it lit up. The lights from the other side light up
> this other half and he was right there, and I bent down and I saw his
> face dead in my face right there, and he upped that pistol at me."

Antoine Lacey testified that he was also known as Adam Torres; that he was currently

incarcerated due to felony convictions for aggravated assault and weapon possession by a felon; that, in 2000, he was a member of the Latin Dragons and he resided at 8707 Escanaba in Chicago; and that the rivals of the Latin Dragons in 2000 were the Latin Kings. On April 1, 2000, at approximately 9 p.m., he was "hanging out" in front of 8707 Escanaba, with a group that included Carlos Luna, Anna Campos, Camelia Prado, "Beto," Joseph Gonzalez and Ricardo Vasquez. Lacey testified that the victim, Vasquez, was "[o]ne of my gang-affiliated friends." On April 1, Lacey testified that he (Lacey) was either 17 or 18 years old.

Lacey testified that at approximately 9:20 p.m., he was standing on the sidewalk; and that it was dark, but the porchlight and the streetlights were on. Lacey observed "[a] blue short body vehicle, maybe a Buick or Cadillac model coming from eastbound going west, make a left on Escanaba." The vehicle was "traveling 5 or 10 miles" per hour, and then it stopped, and "everybody [says] who is that." The vehicle contained two occupants, a driver and a passenger. Lacey estimated that he was standing 12 to 13 feet away from the vehicle when he looked into it. Carlos Luna "ran up to the car"; "he said who is that" and "they started firing shots."

Lacey testified that, prior to the shots, he had recognized the passenger in the vehicle. Lacey testified "I seen him in the mall before." The mall was the River Oaks Mall. After Lacey recognized the passenger, the passenger started firing. Lacey identified defendant in court as the passenger. Lacey testified that when defendant started firing, the driver moved back, and that defendant was firing towards Carlos Luna. The gun was "[m]aybe like in front of the driver's face," and the driver's window was down. Lacey testified that while Luna "fell back," he (Lacey) "was in shock" and he kept looking at defendant. Lacey testified that he was located behind Luna

7

and that the vehicle was right in front of him. Lacey testified that he did not recall how many shot were fired, and that there were "maybe like 5 or 6."

Lacey testified that after the shooting ceased, the vehicle "sideswiped a green van." Vasquez had been hit, and was "trying to catch his breath." At some point, the police "said that they had caught the shooter and they took us where they caught him at," which was east 97th Street and Ewing. Lacey traveled with Camelia Prado and Joseph Gonzalez to this location. First Lacey identified a vehicle as the shooter's vehicle and then identified defendant as the shooter. During the identification process, the police "put the shooter in front of the car," and "they turned on the high beams, and they asked us if it was him." At trial, Lacey identified photographs of the crime scene and the shooter's vehicle.

On cross-examination, Lacey testified that he had previously provided a description of the shooter to the police, in which he stated that the shooter was between 18 and 25 years old. He did not recall whether he told the police that the shooter's complexion was "unknown." He did not tell the police at the crime scene that he recognized the shooter from the mall, because he answered only the questions posed to him. Lacey testified that during the shooting, he saw the flashes from the gun.

Officer Edward Maras of the Chicago police department testified that on April 1, 2000, he was working in plain clothes and in an unmarked vehicle, when he received information over the radio from his sergeant that a man had been shot near 8707 Escanaba and the suspects were "two youthful Hispanics in a 4 door light gray or light blue Cadillac" with "some damage to the passenger's side of the vehicle." At approximately 10:20 p.m., Officer Maras was in the vicinity

of 3650 East 97th Street, when he observed defendant "pulling up" alone in a vehicle that matched the description of the shooter's vehicle. Officer Maras and his two partners approached defendant, and then Officer Maras called on the radio to the detectives in the case, to ask them to bring the witnesses to defendant's location. After the detectives transported the witnesses, the witnesses identified the vehicle and the defendant in "a street showup." Officer Maras explained: "We placed the subject Rodriguez out in the open, illuminated him with the lights and flashlight so he could be identified [and] so he wouldn't be able to see the witnesses through the glare ***." Officer Maras testified that 3650 East 97th Street is approximately "a mile, maybe a little more" from 8707 South Escanaba. Officer Maras identified photographs of the vehicle which depicted damage to the passenger side.

Prior to the testimony of Francisco Ortiz, the defense moved in limine to bar the State from asking Ortiz whether defendant was a member of the Latin Kings. The trial court ruled that if the defense "open[ed] the door," then the court would permit the question about defendant's gang membership.

Ortiz testified that he was currently incarcerated; that he had four felony convictions; and that in April 2000, he was 15 years old and he had then known defendant for about a year. On April 1, 2000, at approximately 10 a.m. or noon, defendant came to Ortiz's home and asked if Ortiz "wanted to go out" and if Ortiz had a gun. Ortiz testified that defendant stated he wanted a gun because "he wanted to take care of some business, something about his car happening over some Dragons." Ortiz testified that defendant stated that some Latin Dragons had hit his vehicle the night before, and dented the passenger side. Ortiz testified that defendant drove a "bluish

9

gray, bluish green" Buick or Cadillac, and Ortiz observed the damage. At trial, Ortiz identified photographs of defendant and his vehicle.

On cross-examination, Ortiz denied having told the police that, on April 1, 2000, he left his home at 10:30 p.m. and that he observed defendant being stopped by the police. At trial, Ortiz testified that he remained at home the entire evening.

Scott Rochowicz, a forensic scientist with the Illinois State Police, testified that he had tested the gunshot residue recovered from defendant's hands on April 1, 2000. He testified that his opinion, to a reasonable degree of scientific certainty, was that the level of residue found on defendant's hands was "consistent with" defendant "discharging a firearm, handling a firearm, or being in close proximity to a firearm when it was discharged." On cross-examination, Rochowicz testified that it was "possible" that if a gun was fired close to a steering wheel, residue could be deposited on the wheel, and if someone touched the wheel, the residue could be transferred to the person's hands. On redirect, he testified that "the probabilities are very slim" of receiving residue from a steering wheel. Considering the results that he received in this particular case, he testified "it would be an unlikely scenario."

Before the last witness, the trial court held the jury instruction conference, where the court asked counsel to state their objections, if any, to the proposed instructions. Defense counsel objected to two instructions which the trial court then withdrew. With respect to the instruction concerning eyewitness identification that is at issue on this appeal, the trial court and counsel had the following colloquy:

"THE COURT: People's number 13 is IPI criminal 3.15.

MR. MAYFIELD (defense counsel): No objection.

THE COURT: Given."

Adrienne Segovia, a pathologist and deputy medical examiner with Cook County, testified that she performed an autopsy on Ricardo Vasquez on April 2, 2000, and concluded that he died from a bullet that pierced his arm, lungs and heart. She recovered the bullet from the body.

The jury also received several stipulations. First, the parties stipulated that defendant was arraigned on May 19, 2000, for the murder of Ricardo Vasquez, that defendant was released on bond on June 4, 2001, that he failed to appear for his next scheduled court date, and that defendant was apprehended on February 19, 2004. Second, the parties stipulated that a gunshot residue kit was administered to defendant's hands on April 1, 2000, at 11:40 p.m., and that there was a proper chain of custody maintained over the kit at all times. Third, the parties stipulated that, if Officer Gina Pelkey of the Chicago police department were called to testify, she would state that she interviewed state witness Joseph Gonzalez and that her report described the shooter's complexion as unknown, his hair as short, dark and shaved, and his age as between 18 and 25 years old. Fourth, the parties also stipulated that, if Officer Angelo Pesavento of the Chicago police department were called to testify, he would state that "he wrote in his supplemental report that Francisco Ortiz and his brother Gabrielle Jalomos went outside on April 1, 2000, at 2230 hours and saw Daniel Rodriguez stopped by the police."

On September 21, 2005, the jury returned a verdict and found defendant guilty of the first-degree murder of Ricardo Vasquez. The jury also found that defendant personally discharged the

11

No. 1-07-0137

firearm that proximately caused Vasquez's death.

On November 1, 2005, defendant filed two motions for a new trial. One motion sought a new trial on the basis that state witness Francisco Ortiz had signed a statement in which he recanted his trial testimony. The second motion made general allegations that the State's witnesses were impeached, that the state failed to prove guilt beyond a reasonable doubt and that defendant was denied due process of law. The trial court denied the motions for a new trial, finding that Ortiz's testimony in support of the motion was not credible.

On December 28, 2006, the trial court sentenced defendant to 45 years of incarceration, which was the minimum available sentence. The sentence included a 25-year enhancement for discharging the firearm that proximately caused the victim's death. The 45-year sentence runs consecutively to another 20-year sentence, for an unrelated conviction for attempted first-degree murder. This appeal followed.

ANALYSIS

On appeal, defendant claims, first, that the trial court abused its discretion by using a certain portion of an Illinois pattern jury instruction; and second, that trial counsel was ineffective for not moving to suppress show-up identifications of defendant. Defendant claims that social science evidence indicates that part of Illinois Pattern Jury Instructions, Criminal, No. 3.15 (4th ed. 2000) (IPI Criminal 4th) is based on a mistaken assumption, namely that an identification is more credible if the witness is more certain. For the following reasons, we find that the trial court did not abuse its discretion and that trial counsel was not ineffective.

(1) Jury Instruction Regarding Eyewitness Identification

12

No. 1-07-0137

Defendant's first claim on appeal is that the trial court abused its discretion by using a portion of IPI Criminal 4th No. 315, because it was allegedly out-dated based on recent social science research.

### (a) Standard of Review

Before examining the substantive issue, we must ascertain the correct standard of review. Defendant concedes in his appellate brief that he waived this issue for review, because his trial counsel did not object to this instruction either at trial or in his posttrial motion. The Illinois Supreme Court has held that a "defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review." People v. Woods, 214 Ill. 2d 455, 470 (2005); People v. Piatkowski, 225 Ill. 2d 551, 564 (2007).

When a defendant has failed to preserve an error for review, we may still review for plain error. Piatkowski, 225 Ill. 2d at 562-63 ("an unpreserved jury-instruction error is reviewed under the plain error analysis"). "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threaten[s] to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." Piatkowski, 225 Ill. 2d at 565; Woods, 214 Ill. 2d at 471. With plain error analysis, "it is the defendant who bears the burden of persuasion with respect to prejudice." Woods, 214 Ill. 2d at 471. However, in order to find plain error, we must first find that the trial court committed some error. Piatkowski, 225 Ill. 2d at 564 ("the first step

13

No. 1-07-0137

is to determine whether error occurred").

We apply this plain-error review to an issue that already carries an abuse -of- discretion standard of review. On appeal, a reviewing court will reverse a trial court's determination about what instructions to give, only if the trial court abused its discretion. Schultz v. Northeast Illinois Regional Commuter R.R. Corp., 201 Ill. 2d 260, 273 (2002). When deciding whether a trial court abused its discretion, a reviewing court will examine the jury instructions in their entirety, to determine whether they fairly, fully and comprehensively informed the jury of the relevant law. Schultz, 201 Ill. 2d at 273-74. An abuse of discretion occurs "only where the [trial court's] ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person could take the view adopted by the trial court." People v. Purcell, 364 Ill. App. 3d 283, 293 (2006).

Ordinarily, a reviewing court will not reverse a trial court, even if the trial court gave faulty instructions, unless the instructions clearly misled the jury and resulted in prejudice to the appellant. Schultz, 201 Ill. 2d at 274. Thus, even if defendant is correct that the instruction at issue was faulty, we will not reverse unless the fault created prejudice.

(b) Validity of Instruction

Having established the correct standard of review, we can now proceed to examine the substantive question, whether the trial court erred by using a portion of IPI Criminal 4th No. 3.15.

The version of IPI Criminal No. 3.15, that was in effect in 2005, at the time of defendant's trial,[1] stated:

---

[1]In 2003, two years prior to defendant's trial, the IPI committee changed this instruction

14

"When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following:

[1] The opportunity the witness had to view the offender at the time of the offense.

[2] The witness's degree of attention at the time of the offense.

[3] The witness's earlier description of the offender.

[4] The level of certainty shown by the witness when confronting the defendant.

[5] The length of time between the offense and the identification confrontation." IPI Criminal 4th No. 3.15 (Supp. 2003).[2]

On appeal, defendant objects to the trial court's decision to give the fourth factor: the certainty shown by the witness.

---

to remove the bracketed "or"s between the factors. Piatkowski, 225 Ill. 2d at 562 n.1, citing IPI Criminal 4th No. 3.15 (Supp. 2003). Our supreme court has ruled that giving IPI Criminal 4th 3.15 with the "or"s between the factors is error. People v. Herron 215 Ill. 2d 167, 191 (2005).

[2]The trial court provided this instruction, without the bracketed numbers, to the jury in both its written and oral jury instructions. In the written instructions, it is labeled as "People's Instruction No. 13."

Supreme court rules require trial courts to use those Illinois Pattern Jury Instructions that are both (1) applicable to the facts and law of the case; and (2) correct statements of law. Supreme Court Rule 451(a) states unequivocally that a trial court "shall" use "the Illinois Pattern Jury Instruction[], Criminal (4th ed. 2000)" when it is "applicable in a criminal case, giving due consideration to the facts and the governing law *** unless the court determines that it does not accurately state the law." 210 Ill. 2d R. 451 (a); Piatkowski, 225 Ill. 2d at 566 (prior version of IPI Criminal 4th was not an accurate statement of the law, because it was internally inconsistent, as previously worded). The use of the word "shall" in the rule makes clear that use of the IPI is not optional, but mandatory. Ultsch v. Illinois Municipal Retirement Fund, 226 Ill. 2d 169, 179 (2007) (the use of the word "shall" indicates a mandatory requirement). Although pattern instructions are not themselves law and are open to challenge if they are inaccurate statements of the law, the instructions are mandatory, if applicable and accurate. Schultz, 201 Ill. 2d at 273; Powers v. Illinois Central Gulf R.R. Co., 91 Ill. 2d 375, 385 (1982) (although mandated by supreme court rule, IPI are open to legal challenge until "considered" and upheld by our supreme court).

Defendant does not argue either that IPI Criminal 4th No. 3.15 was inapplicable or that it misstated Illinois law – nor could he. As for applicability, the IPI committee instructs trial courts to "[g]ive this instruction when identification is an issue." IPI Criminal 4th, No. 3.15, Committee Note at 107. There is no dispute that identification was an issue.

As for legality, our supreme court has held that the five factors listed in the instruction are an accurate statement of the law "for assessing the reliability of identification testimony."

16

Piatkowski, 225 Ill. 2d at 567. These factors are commonly known as the Biggers factors, and were taken from a United States Supreme court case of the same name. Piatkowski, 225 Ill. 2d at 567 (the five factors listed in the instruction were taken from a United States Supreme Court case), citing Neil v. Biggers, 409 U.S. 188, 199-200, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382 (1972). They are undisputedly the law in Illinois for the purpose of assessing the reliability of an identification. People v. Jackson, 348 Ill. App. 3d 719, 739-40 (2004) ("This new instruction is in accord with the well-settled principle that there are five factors that should be considered in determining the reliability of identification evidence."); Piatkowski, 225 Ill. 2d at 567 (the five factors listed in the instruction are the same factors to be used to assess the reliability of an eyewitness identification).

Instead of trying to argue illegality or inapplicability, defendant argues that the fourth factor listed in IPI Criminal 4th No. 3.15 is simply out of date, in light of recent social science research. This instruction was created just eight years ago for the purpose of "help[ing] jurors negotiate the hidden complexities of identification testimony." Herron, 215 Ill. 2d at 190-91. Defendant claims that recent research shows that the instruction, at least in part, does not serve its purpose.

In support of his claim, defendant cites this court's recent decision in People v. Allen, 376 Ill. App. 3d 511 (2007). In Allen, this court stated that it was a "commonly accepted misconception[]"[3] that a witness' level of certainty was well correlated to the accuracy of his or

---

[3]Although these factors are called "commonly accepted" by some, they were listed in the instruction because the IPI committee thought just the opposite – that the average juror might not

her identification.  <u>Allen</u>, 376 Ill. App. 3d at 524, *c.f.*  <u>People v. Enis</u>, 139 Ill. 2d 264, 288-89 (1990) (our supreme court used the word "'misconception'" when describing this factor but first put the word in quote marks).  This court held that a defendant had a right to present eyewitness expert testimony challenging this "misconception," so long as the trial court found that the testimony would assist the jury.  <u>Allen</u>, 376 Ill. App. 3d at 524-25.  This court held that a defendant could challenge this factor, without identifying it as one of the <u>Biggers</u> factors.  <u>Allen</u>, 376 Ill. App. 3d at 524-25.

Attempting to build on <u>Allen</u>, the defendant in the case at bar is trying to knock out this <u>Biggers</u> factor, not just for his case but for all time.  Here's the legal problem in a nutshell.  On the one hand, there is <u>Allen</u>, which says that a defendant can try to knock out this <u>Biggers</u> factor with social science research, in his particular case.  <u>Allen</u>, 376 Ill. App. 3d at 524-26. On the other hand, there is a long line of cases holding that the <u>Biggers</u> factors, all five of them, are required, when assessing the reliability of an identification. *E.g.* <u>Jackson</u>, 348 Ill. App. 3d at 739 (noting "the well-settled principle that there are five factors that should be considered in determining the reliability of identification evidence").

There is an easy way to reconcile <u>Allen</u> with the prior line of cases.  <u>Allen</u>, 376 Ill. App. 3d at 524-26. Although  all five factors are generally required, the IPI  permits a trial court to omit a particular factor, if such an omission is warranted by the evidence in that individual case.  When

be aware of these "hidden complexities of identification testimony."  <u>Herron</u>, 215 Ill. 2d at 190-91.

No. 1-07-0137

the IPI committee added IPI Criminal 4th No. 315 to its pattern instructions, [4] the committee stated that the trial judge should give only those "numbered paragraphs that are supported by the evidence." IPI Criminal 4th No. 3.15, Committee Note, at 107 (ed. 2000). In 2003, the IPI committee added a paragraph to its notes to make crystal clear that the trial court could omit a factor, based on the evidence presented in the case. The 2003 notes stated: "'The jury should be instructed on only the factors with any support in the evidence. Other factors should be omitted.'" People v. Herron, 215 Ill. 2d 167, 191 (2005), quoting IPI Criminal 4th No. 3.15, Committee Note, at 2 (Supp. 2003).

Thus, a trial court may omit one of the Biggers factors listed in IPI Criminal 4th No. 315 based on the "evidence," and the "evidence" may include the kind of social science evidence proposed in Allen. Allen, 376 Ill. App. 3d at 524 (describing the expert's proposed testimony). For example, if the defendant in the case at bar had introduced into evidence the testimony of an expert in eyewitness identification research,[5] the trial court may have chosen, based on the evidence presented in the case, to omit one of the listed factors. [6] Allen, 376 Ill. App. 3d at 526

_____

[4]Instruction No. 3.15 was added in 2000 by the fourth edition of the pattern instructions. IPI Criminal 4th No. 3.15, Committee Note, at 2 (Supp. 2006) (noting that this instruction was added in the fourth edition).

[5]Any proposed expert testimony would be subject to the normal "scrutiny" of reliability, relevance and whether it assisted the jury. Allen, 376 Ill. App. 3d at 525-26.

[6]The trial judge in the case at bar, the Honorable Bertina E. Lampkin, would have been particularly well-suited to hear this argument, since she was on the IPI committee in 2000 when

19

(this court reversed defendant's conviction because the trial court refused the proposed testimony of an eyewitness identification expert without first conducting "a meaningful inquiry" into its relevance); W. Wolfson, "That's the Man!" Well, Maybe Not: The Case for Eyewitness Identification Expert Testimony, 26 A.B.A. Sec. Litig. J. 5, 6 (Winter 2000) (noting that there are "behavioral scientists who are prepared to say" that there is little or no correlation between the witness' certainty and the accuracy of his or her identification). But see People v. Enis, 139 Ill. 2d 264, 289 (1990) ("So-called experts can usually be obtained to support most any position. *** We are concerned with the reliability of eyewitness expert testimony***."). However, no such evidence was offered at this trial.

On appeal, defendant argues that the trial court, without any contrary evidence before it, should have acted on its own initiative to omit the fourth factor. The irony, of course, is that if the trial court had done just that, defendant could have filed an appeal claiming that the spontaneous omission of the fourth factor prejudiced him. People v. Houston, 229 Ill. 2d 1, 10 (2008) (on appeal, defendant claimed that his trial counsel was ineffective for failing to request IPI Criminal 4th No. 3.15); Jackson, 348 Ill. App. 3d at 739 ("five factors *** should be considered in determining the reliability of identification evidence.").

There is also an argument to be made that the fourth factor of IPI Criminal 4th No. 3.15 concerns only the witness's level of certainty at the initial identification, and that the social science research targets primarily the witness' level of certainty while testifying at trial, and thus the latter

the committee adopted this instruction, and she subsequently became its chairperson of the committee. IPI Criminal 4th, p. v (2000 and Supp. 2006).

20

No. 1-07-0137

cannot be used to disparage the former. People v. Smith, 299 Ill. App. 3d 1056, 1062 (1998) (considering only the witness' level of certainty at the initial identification); C. Mayer, Due Process Challenges to Eyewitness Identification Based on Pretrial Photographic Arrays, 13 Pace L. Rev. 815, 845 (1994) ("studies have indicated that juries are highly influenced by a confident witness").  Expert testimony may dispel the mythology that a witness' performance on the witness stand is correlated to the accuracy of his or her identification. Allen, 376 Ill. App. 3d at 526 (prosecutor capitalized on witness' "apparent confidence on the witness stand" during closing argument). However, while the drafters of IPI Criminal 4th No. 3.15 may have intended this factor to refer only to the initial identification, there is no question that courts, including our own supreme court, have considered the witness' certainty at trial, when applying this factor. Piatokowski, 225 Ill. 2d at 569 (noting that the witness' identification was "unequivocal" at "a photo array, a lineup and again at trial"); People v. Simpson, 172 Ill. 2d 117, 142 (1996) (noting the witness' certainty both at  the lineup and "in court").  Still, this argument lends support to our conclusion.   Even if we took the position that the fourth factor of Criminal 4th No. IPI 3.15 has nothing to do with the level of confidence shown by the witness at trial, it would not change our conclusion. Admittedly, the fourth factor could and should be more precisely drawn to avoid the confusion we see in this case.  But that does not change the conclusions reached by the too-often ignored scientific research into eyewitness identification.

On appeal, defendant claims, not that the fourth factor is against the law, but   that it is against "the wide body of social research and developing law around the country."  See  Smith v. Marvin, 377 Ill. App. 3d 562, 567-68 (2007) (where instruction was an accurate statement of the

21

law, defendants cannot establish prejudice requiring a new trial). In essence, defendant argues that the trial court should have <u>sua</u> <u>sponte</u> redrafted the instruction, in light of "social research" and changes in other legal forums.

In Illinois, the job of drafting pattern jury instructions was not given to the trial courts or the appellate courts. IPI Civil, at xxiv-xxv (ed. 2006). Our supreme court gave that job to the Illinois Supreme Court Committee on Pattern Jury Instructions, and required its lower courts to use the pattern instructions, unless the committee failed to state "the law" accurately. 210 Ill. 2d R. 451(a); IPI Civil, at xix (ed. 2006). Even if Illinois judges believe they could do a better job than the committee, they should still use the pattern instruction, unless it is not an accurate statement of the law in Illinois. 210 Ill. 2d R. 451(a); <u>Torres v. Irving Press, Inc.</u>, 303 Ill. App. 3d 151, 157-58 (1999) (rejecting a court's attempt to improve on the word "disability" in the pattern jury instruction by substituting the phrase "loss of normal life").

The state appellate defender, who represents defendant in this appeal, is trying to eliminate this <u>Biggers</u> factor from IPI Criminal 4th No. 3.15, for all time. This factor does not always favor the prosecution (or the defense, for that matter.) Compare <u>Houston</u>, 229 Ill. 2d at 10 (state appellate defender argued that trial counsel was ineffective for failing to <u>request</u> IPI Criminal 4th No. 3.15), with <u>People v. McGee</u>, 373 Ill. App. 3d 824, 836 (2007) (state appellate defender argued that trial counsel was ineffective for failing to <u>object</u> to IPI Criminal 4th No. 3.15). In the case at bar, one could argue that this factor helped the defense, because two of the four eyewitnesses testifying at trial were <u>certain</u> that they could <u>not</u> identify the defendant.

22

Whether this factor favors one side or the other turns on the individual facts of the case. In the next case, the defense may very well need this factor to challenge an identification. McGee, 373 Ill. App. 3d at 836 (finding that IPI Criminal 4th No. 3.15 "could help a defendant" and could be a part of a defendant's "sound trial strategy"). Certainly, if a state witness wavered on the stand when confronted with the defendant, that would be a factor that the defense would want highlighted in the jury instructions. The wiser course is to decide this issue on a case-by-case basis, as both Allen and the IPI committee encourage the trial court to do. Allen, 376 Ill. App. 3d at 524-26; IPI Criminal 4th No. 3.15, Committee Note, at 2 (Supp. 2006). See also Enis, 139 Ill. 2d at 289-90 (endorsing a case-by-case approach to admitting eyewitness expert testimony about the correlation between a witness' certainty and the accuracy of his or her identification); People v. Tisdel, 338 Ill. App. 3d 465, 468 (2003) ("a trial court's decision to allow or exclude eyewitness identification expert testimony must be made on a case-by-case basis').

In sum, we cannot find that the trial court abused its discretion when, without any conflicting evidence, it chose to use all the factors listed in IPI Criminal 4th No. 315. Enis, 139 Ill. 2d at 289 (trial court's exclusion of expert testimony, even if reliable and relevant, concerning only the factor of witness certainty was not enough, by itself, to constitute an abuse of discretion). Since we find no error, we do not need to engage in a plain error analysis.

### (2) Ineffective Assistance of Counsel Claim

Defendant's second claim on appeal is that his trial counsel was ineffective for failing to file a motion to suppress two show-up identifications. In his reply brief, defendant added that counsel was also ineffective for failing to object to the use of the fourth factor in IPI Criminal 4th

23

No. 1-07-0137

No. 3.15.

The contested show-up identifications occurred at the location where Officer Maras first observed defendant, approximately a mile from the shooting, and at approximately 10:20 p.m., an hour after the shooting.[7] Three eyewitnesses sat in the back of a police vehicle, while defendant stood in the street illuminated by a flashlight and vehicle lights. Two of the witnesses identified defendant as the shooter, while one could not make an identification.

The Illinois Supreme Court has held that, to determine whether a defendant was denied his or her right to effective assistance of counsel, an appellate court must apply the two-prong test set forth in Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 76,[h] 104 S. Ct. 2052 (1984). People v. Colon, 225 Ill. 2d 125, 135 (2007), citing People v. Albanese, 104 Ill. 2d 504 (1984) (adopting Strickland). Under Strickland, a defendant must prove both that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. Colon, 225 Ill. 2d at 135; People v. Evans, 209 Ill. 2d 194, 219-20 (2004); Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

Under the first prong of the Strickland test, the defendant must prove that his counsel's performance fell below an objective standard of reasonableness "under prevailing professional norms." Colon, 225 Ill. 2d at 135; Evans, 209 Ill. 2d at 220.

Under the second prong, the defendant must show that, "but for" counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. Colon, 225 Ill. 2d at 135; Evans, 209 Ill. 2d at 220. "[A] reasonable probability that the

---

[7]Officer Maras testified that he first observed defendant at approximately 10:20 p.m.

24

result would have been different is a probability sufficient to undermine confidence in the outcome – or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." Evans, 209 Ill. 2d at 220; Colon, 225 Ill. 2d at 135. To prevail, the defendant must satisfy both prongs of the Strickland test. Colon, 225 Ill. 2d at 135; Evans, 209 Ill. 2d at 220.

First, defense counsel's alleged failure to object to the fourth factor in IPI Criminal 4th No. 3.15 did not cause his performance to fall below "prevailing professional norms." Colon, 225 Ill. 2d at 135; Evans, 209 Ill. 2d at 220. "Decisions concerning defense counsel's choice of jury instructions are characterized as tactical decisions within the judgment of defense counsel." Houston, 363 Ill. App. 3d at 575. "Trial strategy cannot be a basis for finding counsel ineffective." Houston, 363 Ill. App. 3d at 575. In the case at bar, trial counsel chose to argue in his closing to the jurors that they should rely on "the things" in IPI Criminal 4th No. 3.15 when evaluating the eyewitness testimony. McGee, 373 Ill. App. 3d at 837 (although defendant claimed on appeal that his trial counsel was ineffective for failing to object to IPI Criminal No. 4th 3.15, this court found that counsel's use of the instruction during his closing indicated that the instruction was part of his trial strategy). As previously noted, two of the four eyewitnesses testifying at trial were certain that they could not identify defendant.

Failure to request a particular jury instruction may be grounds for finding ineffective assistance of counsel, only if the instruction was so "critical" to the defense that its omission "den[ied] the right of the accused to a fair trial." People v. Pegram, 124 Ill. 2d 166, 174 (1988); People v. Pollards, 367 Ill. App. 3d 17, 23 (2006). Our supreme court has held that a new trial

25

was not warranted when a trial court excluded defense evidence trying to knock out "this factor alone," even assuming that the evidence was reliable and relevant. Enis, 139 Ill. 2d at 289 (referring to the correlation between witness certainty and the accuracy of the identification). Thus, inclusion of "this factor alone" cannot have been so critical as to deny defendant the right to a fair trial. Enis, 139 Ill. 2d at 289.

Second, even if defense counsel had moved to suppress the show-up identifications, it is not reasonably probable that the motion would have been granted. "In order to establish prejudice resulting from failure to file a motion to suppress, a defendant must show a reasonable probability that: (1) the motion would have been granted, and (2) the outcome of the trial would have been different had the evidence been suppressed." People v. Bew, 228 Ill. 2d 122, 128-29 (2008) (reviewing a claim of ineffective assistance of counsel), quoting People v. Patterson, 217 Ill. 2d 407, 438 (2005).

The show-up identifications would not have been suppressed, because they were not unnecessarily suggestive. Normally, the jury decides the weight that an identification deserves; and the less reliable the jury finds the identification to be, the less weight the jury will give it. People v. Ramos, 339 Ill. App. 3d 891, 897 (2003). However, sometimes an identification is so "unnecessarily suggestive" that the due process clause prevents it from ever reaching the jury. Ramos, 339 Ill. App. 3d at 897 (discussing U.S. Const., amend. XIV).

When ruling on a motion to suppress a show-up under the due process clause, a trial court conducts a two-part inquiry. Ramos, 339 Ill. App. 3d at 897. "First, the defendant must prove that the confrontation was so unnecessarily suggestive and conducive to irreparable

misidentification that he was denied due process of law." Ramos, 339 Ill. App. 3d at 897. If the defendant satisfies this burden, then the burden switches to the State to prove that the identification was "independently reliable." Ramos, 339 Ill. App. 3d at 897. The factors used to measure reliability are the same five factors listed in IPI Criminal 4th 3.15. Ramos, 339 Ill. App. 3d at 897-98 (describing the factors).

To satisfy his burden, defendant claims on appeal that the show-up procedure was unnecessary, because the police could have conducted a line-up instead. By placing ourselves in the shoes of the reasonable police officer, we can see that a show-up was not 'unnecessary.' What options did Officer Maras have open to him, when he spotted a vehicle that matched the description of the shooter's vehicle, as relayed over the police radio?[8] At that moment, Officer Maras had the reasonable suspicion required for a brief investigative detention, commonly known as a Terry stop. People v. Lippert, 89 Ill. 2d 171, 182 (1982), discussing Terry v. Ohio, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). He could detain the suspect long enough to confirm or dispel his suspicions. Lippert, 89 Ill. 2d at 182 (the need to dispel suspicion during a Terry stop "might require *** detention until witnesses could arrive who might provide positive identification"). However, he may have been concerned that his information did not rise to the level of the probable cause[9] required for a full custodial arrest. Lippert, 89 Ill. 2d at 182 ("The

_____

[8]Officer Maras testified that he received information "on the radio from [his] sergeant" that there had been a shooting nearby involving "two male Hispanics in a 4 door light gray or light blue Cadillac" with "some damage to the passenger side of the vehicle."

[9]"Probable cause for arrest exists when facts and circumstances within the arresting

27

line of demarcation between a legitimate seizure of a suspect on less than probable cause in a Terry stop and an impermissible seizure tantamount to a full-blown arrest \*\*\* is not completely clear."). If, at that moment, Officer Maras had handcuffed defendant, and transported him in a police vehicle to a police station, and held him in custody for the length of time required to arrange a line-up, defendant would have argued on appeal that the officer's actions qualified as an arrest, that the officer lacked probable cause, and that the results of the line-up should have been suppressed.

Balancing the dictates of the fourth amendment against the need for reliable identifications, the Illinois Supreme Court has held that "prompt showups near the scene of the crime" can be proper police procedure, under certain circumstances. Lippert, 89 Ill. 2d at 181-84, 188, cited in Ramos, 339 Ill. App. 3d at 897. While show-ups are disfavored, they may be justified by circumstances, such as the need to determine (1) whether a suspect is innocent and should be released immediately; and (2) whether the police should continue searching for a fleeing culprit while the trail is still fresh. Ramos, 339 Ill. App. 3d at 897, quoting People v. Hicks, 134 Ill. App. 3d 1031, 1036 (1985); Lippert, 89 Ill. 2d at 188.

Defendant claims that neither of these justifications for a show-up applied in his case because (1) the police would not have released him, even if the witnesses had cleared him, because he was guilty of driving a motor vehicle as a 15-year old; and (2) the driver of the

_____

officer's knowledge are sufficient to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested has committed the offense." Lippert, 89 Ill. 2d at 178.

28

shooter's vehicle was still at large, thus requiring the search to continue.

As to his first contention, the trial court ruled that no evidence had been introduced to establish defendant's age. When defense counsel tried to argue in closing that defendant was only 15 years old, the trial court sustained the State's objection stating that "[t]here is no evidence in this record of the age of the defendant at the time of this offense." The record on appeal contains an arrest report with defendant's birth date. However, defendant does not point to any evidence in the record showing that, prior to the show-up, the police knew defendant's age.

As to his second contention, although the driver of the shooter's vehicle was still at large, the police may have chosen, in their discretion and considering limited law enforcement resources, to suspend the search for a less culpable accomplice, once the murderer had been identified by eyewitnesses.

Defendant also claims that the procedure was unnecessarily suggestive because (1) the police told the witnesses, prior to the identification, that the shooter had been found;[10] (2) the police shined a light on defendant during the identification; and (3) the police did not separate the witnesses.

First, if a show-up could be invalidated on the ground that the police indicated that they had found a suspect, then no show-up could pass muster; and our supreme court has already held that a show-up can be a proper police procedure. Lippert, 89 Ill. 2d at 188. In support of his

---

[10]Antoine Lacy, one of the eyewitnesses who identified defendant during the show-up, testified that "[t]hey said that they had caught the shooter and they took us where they had caught him at."

contention that police statements invalidated the show-up, defendant cites two cases: People v. Kennard 204 Ill. App. 3d 641 (1990); and People v. Lee, 44 Ill. 2d 161 (1969). In Kennard, this court held that a show-up was unnecessarily suggestive, but we did not state why, because we went on to hold that the show-up was "sufficiently reliable to be admissible." Kennard, 204 Ill. App. 3d at 652. Defendant claims that the show-up in Kennard was unnecessarily suggestive, because a store security guard told the witness: "Come over here. I think I got the guy who robbed you." Kennard, 204 Ill. App. 3d at 646. However, the reason for the Kennard holding could just as easily have been the fact that the show-up occurred while the Kennard defendant was sitting in custody, in the back of a police squad vehicle. Kennard, 204 Ill. App. 3d at 651.

In Lee, the second case cited by defendant, our supreme court held that a show-up was unnecessarily suggestive, where the defendant had already been in police custody for over a month, and where the witnesses viewed the defendant while he was handcuffed to a person whom these same witnesses had previously identified in a lineup as a perpetrator of the crime. Lee, 44 Ill. 2d at 167-69. The facts in our case are radically different from the facts in Lee. In the case at bar, only an hour had elapsed since the crime, and the police were in hot pursuit of a fleeing murderer. People v. Thorne 352 Ill. App. 3d 1062, 1077 (2004) (a show-up near the crime scene, a short time after the robbery occurred, was proper because officers were "in hot pursuit"). In addition, defendant was not handcuffed to an already identified perpetrator. Thus, the holding in Lee has little bearing on the case at bar.

Defendant also claims that the lighting and the simultaneous viewing by the eyewitnesses invalidated the show-up. In support of these two claims, defendant cites only a trial-court opinion

No. 1-07-0137

from New York. Jones v. West, 473 F. Supp. 2d 390, 418 (W.D.N.Y.). However, the Illinois Appellate Court recently upheld a similar procedure, where two eyewitnesses simultaneously identified suspects, upon whom police shined the lights of their squad car. Ramos, 339 Ill. App. 3d at 898.

In the case at bar, the lighting was a necessary part of the procedure to ensure that the eyewitnesses had adequate lighting to make a reliable identification at night, and to ensure that the suspect would not be able to see the witnesses through the glare. Officer Maras testified that the police "had illuminated [defendant] with the lights and the flashlight so he could be identified [and] so he wouldn't be able to see the witnesses through the glare." In Ramos, where police shined the lights of their vehicle on the suspect, this court noted approvingly that the police had ensured that the identification was made "in adequate lighting." Ramos, 339 Ill. App. 3d at 898. Thus, the lighting was not 'unnecessary.'

While a separate viewing would have been the better practice, the simultaneous viewing, by itself, was not enough, on the particular facts of this case, to find that this particular show-up was unnecessarily suggestive. Three witnesses went to the location where defendant was originally stopped by Officer Maras. They were Camelia Prado, Joseph Gonzalez and Antoine Lacy. Prado testified that she was not able to identify defendant as the shooter, while Gonzalez and Lacey testified that they could identify defendant. If defendant's argument is that one of the identifying witnesses might have felt pressured to identify because another witness was also identifying defendant, then he would have felt equally pressured not to identify, because one of the witnesses also chose not to identify. Since any alleged pressure cut both ways, it drops out as

31

an issue on the facts of this case.

Since defendant has failed to show that the show-up was "unnecessarily suggestive, we do not need to proceed to the second step of the due process analysis. We cannot find that counsel's performance was deficient due to the absence of a motion to suppress, when the motion would have failed on the first step.

## CONCLUSION

For the foregoing reasons, we affirm defendant's conviction. First, the trial court did not abuse its discretion by choosing to use all five factors listed in IPI Criminal 4th No. 3.15. Second, the absence of a motion to suppress two show-up identifications and the absence of an objection to the fourth factor of IPI Criminal 4th No. 3.15 did not cause defense counsel's trial performance to sink to the level of constitutional ineffectiveness.

Affirmed.

WOLFSON and HALL, JJ., concur.