# Illinois Official Reports

## Appellate Court

<div style="border: 2px solid black;">

### *People v. Turman*, 2019 IL App (4th) 170815

</div>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARCUS E. TURMAN, Defendant-Appellant. |
| District & No. | Fourth District<br>No. 4-17-0815 |
| Filed | October 23, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 17-CF-85; the Hon. Roger B. Webber, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, John M. McCarthy, and Joshua Scanlon, of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Julia Rietz, State's Attorney, of Urbana (Patrick Delfino, David J. Robinson, and James C. Majors, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE KNECHT delivered the judgment of the court, with opinion.<br>Justices Steigmann and Harris concurred in the judgment and opinion. |

## OPINION

¶ 1    Defendant, Marcus E. Turman, appeals from his conviction for violating section 3 of the Sex Offender Registration Act (Act) (730 ILCS 150/3 (West 2016)). On appeal, defendant argues we should reverse his conviction because the trial court erred when it denied his motion to suppress evidence. We disagree and affirm.

¶ 2                                    I. BACKGROUND
¶ 3                                    A. Information
¶ 4    In January 2017, the State charged defendant by information with violating the Act based on his failure to register his current address with the Urbana Police Department within three days of establishing his residence or temporary domicile in Urbana. *Id.*

¶ 5                                 B. Motion to Suppress
¶ 6    In June 2017, defendant filed a motion to suppress evidence, claiming he was unlawfully seized without reasonable suspicion. Defendant alleged, on January 17, 2017, he was seized when Champaign County sheriff's deputies, in a show of authority, approached, surrounded, and ordered him to dismount from his bicycle. Defendant further alleged that seizure occurred without the requisite reasonable, articulable suspicion to believe he committed or was about to commit a crime. Defendant requested the trial court suppress all evidence obtained following his encounter with the deputies.

¶ 7                                 C. Suppression Hearing
¶ 8    In July 2017, the trial court conducted a hearing on defendant's motion to suppress. Defendant presented testimony from a Champaign County sheriff's deputy who was involved in the January 17, 2017, encounter, Deputy Nicky Bolt. Defendant also introduced into evidence an aerial map. The following is gleaned from the evidence presented.
¶ 9    On January 17, 2017, at 3:55 p.m., Champaign County sheriff deputies, including Deputy Bolt, were dispatched to 813 MacArthur Drive in Urbana for a reported armed robbery. Deputy Bolt believed the armed robbery, a purse-snatching, occurred in the front yard of the residence located at 813 MacArthur Drive. Deputy Bolt identified the location of the armed robbery on the aerial map.
¶ 10    Dispatch provided a description of the armed robbery suspect. The suspect was described as a black male, approximately 5 feet 6 inches tall and of medium build, wearing blue jeans and a black hooded sweatshirt. Deputy Bolt testified the "victim" also reported the suspect left "on foot." Deputy Bolt, along with other deputies and a canine unit, responded to the neighborhood where the armed robbery occurred to search for the suspect.
¶ 11    Deputy Bolt testified she arrived "at the scene" at approximately 4:26 p.m. Deputy Bolt, who was inside a squad car, observed a male, later identified as defendant, on a bicycle on the corner of Pfeffer Road and California Avenue. Defendant's location was approximately "a block, block and a half" away from the location where the armed robbery had occurred. Deputy Bolt identified where defendant was located on the aerial map. Defendant was wearing blue jeans, a black jacket, a black hooded sweatshirt, and a blue hat. Deputy Bolt made an in-court identification of defendant as the person she observed on the bicycle.

¶ 12    Deputy Bolt testified she decided to approach defendant because he was (1) "approximately the same size" as the suspect, (2) "wearing blue jeans, a black jacket[,] and a black hooded sweatshirt," and (3) "riding his bike down Pfeffer [Road]." Deputy Bolt noted that defendant later reported to be 5 feet 7 inches tall and 125 pounds, which she believed to be accurate based on her encounter with him.

¶ 13    On direct examination, Deputy Bolt testified as follows concerning her approach and initial interaction with defendant:

"Q. Okay. Now, you, at that point, when you saw him, you told him to get off the bicycle?

A. Yeah. I asked him if he would speak with us.

Q. Okay. He wasn't free to leave at that time?

A. I didn't tell him he wasn't free to leave. I mean—

Q. He had—

A. —that was never indicated.

Q. But you asked—you ordered him to get off the bicycle?

A. I asked him if he would speak with us, if he would stop and speak with me, yes.

Q. So, you didn't order him to get off the bicycle?

A. No. Not that—

Q. If he had left on his bicycle, would you have tried to stop him?

A. Yes.

Q. Okay. Would you have used force to do that?

* * *

Q. Reasonable force? I'm not—would you have attempted to restrain him from leaving or would you have followed him in your vehicle?

A. I would have followed him.

Q. Okay. For the purposes of stopping him?

A. Yes, but I wouldn't have placed hands on him to stop him at that point."

¶ 14    Deputy Bolt testified that a male deputy, Deputy Hubbard, exited his vehicle, which was located near Pfeffer Road and California Avenue, when he saw her "get out" with defendant. Deputy Hubbard approached where Deputy Bolt was standing. When asked if she and Deputy Hubbard "were on either side" of defendant, Deputy Bolt testified she could not recall their "exact stance" but believed they were both close to defendant and "[p]robably" within arm's length.

¶ 15    At some point, Deputy Bolt called dispatch to complete a Law Enforcement Agencies Data System (LEADS) check. Dispatch reported defendant had a "violation of the sex offender registration out of Peoria County." Deputy Bolt then asked defendant when he last registered, to which defendant stated it was a year prior with the Danville Police Department. Deputy Bolt asked defendant where he was staying, to which defendant stated he had been staying at his aunt's house on Illinois Street for the past three months. After learning this information, Deputy Bolt placed defendant under arrest for failing to register as a sex offender. Deputy Bolt

went to the house of defendant's aunt, which was "just up the block." Deputy Bolt learned from defendant's aunt that defendant had been staying with her for approximately a week.

¶ 16    Defendant was later presented for a "show-up" with the victim of the armed robbery. The show-up was found to be "negative."

¶ 17    On cross-examination, Deputy Bolt testified as follows concerning her interaction with defendant:

> "Q. Okay. After you made contact with him, what did you do?
>
> A. At that point, I informed him who I was and who I worked for and that I stopped him because an armed robbery had just occurred and he matched the description of that armed robbery. While speaking with him, he had—he had difficulty remembering where his aunt's—his aunt lived, telling us his information and he was very fidgety, kept putting his hands in his pocket."

¶ 18    Deputy Bolt also testified that she asked defendant for his name, which defendant provided. She then reported defendant's name to dispatch to complete a LEADS check. Deputy Bolt acknowledged she did not know the exact time the armed robbery occurred but only that she received the dispatch call at 3:55 p.m. and made contact with defendant at "[r]oughly" 4:20 p.m.

¶ 19    By examination of the trial court, Deputy Bolt testified as follows concerning her interaction with defendant:

> "Q. All right. And so the sequence of conversation with him was you stopped him, identified why you were stopping him, that he had matched the description, got his name and then did you immediately run his name through LEADS or was there further conversation first?
>
> A. No. I ran his name through LEADS right after he—
>
> Q. So, basically stopped—
>
> A . —gave me his information.
>
> Q. —told him why you stopped him—
>
> A. Mm-hmm.
>
> Q. —got his name, ran LEADS?
>
> A. Yeah. I believe I had asked him where he had been, and that's when he said he'd been at—he was coming from his aunt's house and going to the gas station. And then after he told me that, that's when I ran his name through LEADS.
>
> Q. Okay. And how long did it take you to get a response from LEADS about the violation?
>
> A. It was within—it was right away. I mean, it came back right away."

¶ 20    Defendant requested the trial court suppress all evidence obtained following his encounter with the deputies, claiming the evidence presented demonstrated he was unlawfully seized without reasonable suspicion. Specifically, defendant asserted he was seized at approximately 4:20 p.m. when Deputy Bolt exited her vehicle to speak with him. At that time, defendant contended, he was not free to leave. In support, defendant highlighted Deputy Bolt's testimony, indicating she was looking for an armed robbery suspect and she would have followed him in her squad car had he attempted to leave. Defendant further asserted the seizure occurred without reasonable suspicion as (1) the description of the armed robbery suspect was "very

vague" and could "fit[ ] various people," (2) defendant did not match the description of the suspect as he was wearing a blue hat and riding a bicycle, and (3) it was unreasonable to believe the suspect would be on a bicycle and only a block and a half away 25 to 30 minutes after the armed robbery occurred.

¶ 21 The State requested the trial court deny defendant's motion to suppress, claiming the evidence presented demonstrated Deputy Bolt had the necessary reasonable suspicion to detain defendant. The State asserted the description of the armed robbery suspect was not vague, since it included the suspect's gender, race, height, build, and clothing. The State further asserted it was reasonable for Deputy Bolt to believe, given the suspect's description and the surrounding circumstances, that defendant was the perpetrator. Specifically, the State highlighted that Deputy Bolt responded to the neighborhood of the armed robbery within a 30-minute window of receiving the dispatch call and discovered defendant who was (1) approximately a block and a half away from the location where the robbery occurred, (2) the same gender and race as the suspect, (3) approximately the same height and build as the suspect, and (4) wearing blue jeans and a black hooded sweatshirt like the suspect. The State acknowledged Deputy Bolt's testimony indicated defendant was wearing additional items of clothing that were not included in the suspect's description and was traveling by bicycle rather than foot but asserted the additional items of clothing and change in transportation may have been missed by the victim or later added by defendant during the 30-minute window.

¶ 22 Following arguments, the trial court denied defendant's motion to suppress. In its oral pronouncement of its decision, the court began by examining whether the initial encounter was a consensual inquiry or an investigatory detention:

"Based on the deputy's testimony, it sounds like this encounter started as a consensual inquiry. She indicated that she asked the [d]efendant if he would stop and talk to her or words to that effect. He did. She was joined by another officer. It wasn't clearly stated, but I think it's reasonable to infer since they were both in squad cars that they were probably both also in uniform. Clearly had some authoritative presence. I would suggest that during the initial questioning this transformed from a consensual encounter to an investigative detention based upon the idea that a reasonable person in the [d]efendant's position probably would not believe he was free to leave at the time that he started being questioned about where he was going, where he lived, how long he'd been there."

¶ 23 After concluding the initial consensual inquiry transformed into an investigatory detention, the trial court turned to whether the investigatory detention was supported by reasonable suspicion. The court found (1) "[t]here was a report of a robbery that was called in at 3:55 p.m.," (2) the suspect's description was "a black male approximately 5′ 6″, medium build, wearing blue jeans and a black hooded sweatshirt," (3) the suspect was "reported as leaving on foot," (4) "[a]pproximately 20 to 25 or 30 minutes after being dispatched, [Deputy Bolt] observed [defendant] on a bicycle about a block or a block and a half away from the location of the robbery," (5) defendant's "height and weight were within the general description" of the suspect, and (6) defendant, like the suspect, was "wearing a black hooded sweatshirt and blue jeans." Based on its findings, the court concluded Deputy Bolt had the necessary reasonable suspicion to justify an investigatory detention. In so concluding, the court acknowledged defendant was wearing additional items of clothing that were not included in the suspect's description and was traveling by bicycle rather than foot. The court stated it was "reasonable

to infer that in 20 minutes a person could get from the scene to a location where there's a bicycle and either put on a hat or perhaps the hat was not noticed or just overlooked in the description from the caller."

¶ 24                          D. Stipulated Bench Trial and Sentencing

¶ 25       In October 2017, the trial court conducted a stipulated bench trial. The parties provided the court with an agreed stipulation of the facts. We note the parties, in part, stipulated to the following: (1) "[a]t approximately 4:20 p.m., [Deputy Bolt] and [Deputy Hubbard] detained and seized [defendant] on his bicycle at the intersection of Pfeffer [Road] and California [Avenue]" and (2) "[a]fter the seizure, Deputy Bolt placed a request to [dispatch] to run [defendant's] name and date of birth through LEADS." We also note the parties made clear they were proceeding with the understanding defendant was preserving the argument he made in his motion to suppress. After considering the stipulated facts, the court found defendant guilty.

¶ 26       In November 2017, the trial court sentenced defendant to 7 days' incarceration, with credit for time served, and 12 months' conditional discharge. The court also ordered defendant to pay certain fines and fees.

¶ 27       This appeal followed.

¶ 28                                    II. ANALYSIS

¶ 29       On appeal, defendant argues the trial court erred in denying his motion to suppress, maintaining the evidence demonstrated he was unlawfully seized without reasonable suspicion. The State disagrees, asserting the evidence demonstrated Deputy Bolt's encounter with defendant was a consensual inquiry that did not need to be supported by reasonable suspicion and, even if the encounter amounted to an investigatory detention, Deputy Bolt had the necessary reasonable suspicion to justify the detention.

¶ 30       As an initial matter, defendant acknowledges he did not raise his claim in a posttrial motion, which would ordinarily forfeit his claim for review, but contends his claim is nevertheless reviewable under the "constitutional-issue exception" to the forfeiture rule. The State agrees. Under the "constitutional-issue exception," "constitutional issues that were properly raised at trial and may be raised later in a postconviction petition" are not subject to forfeiture for failing to file a posttrial motion. *People v. Cregan*, 2014 IL 113600, ¶ 16, 10 N.E.3d 1196. Because the matter proceeded to a stipulated bench trial with the understanding defendant was preserving the argument he made in his motion to suppress and because the matter could have been raised in a postconviction petition, we accept the State's concession and find defendant's claim is subject to review under the constitutional-issue exception. See *id.* ¶¶ 15-20 (finding the constitutional-issue exception applied to permit review of the trial court's denial of the defendant's motion to suppress asserting a violation of constitutional rights, despite the defendant's failure to raise the issue in a posttrial motion).

¶ 31       The fourth amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV; see also *Elkins v. United States*, 364 U.S. 206, 213 (1960) (observing the fourth amendment applies to state officials through the fourteenth amendment). "The 'essential purpose' of the fourth amendment is to impose a standard of reasonableness

upon the exercise of discretion by law enforcement officers to safeguard the privacy and security of individuals against arbitrary invasions." *People v. McDonough*, 239 Ill. 2d 260, 266, 940 N.E.2d 1100, 1106 (2010) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979)).

¶ 32 Police-citizen encounters are generally divided into three tiers:

"(1) arrests, which must be supported by probable cause; (2) brief investigative detentions, or '*Terry* stops[ ]' [(*Terry v. Ohio*, 392 U.S. 1 (1968)),] which must be supported by a reasonable, articulable suspicion of criminal activity; and (3) encounters that involve no coercion or detention and thus do not implicate fourth amendment interests." *People v. Luedemann*, 222 Ill. 2d 530, 544, 857 N.E.2d 187, 196 (2006).

¶ 33 We find, as the trial court concluded, the evidence demonstrated Deputy Bolt had the requisite reasonable, articulable suspicion of criminal activity to justify a brief investigative detention and, therefore, any such seizure did not violate defendant's fourth amendment rights.

¶ 34 The underlying facts are not in dispute. The evidence demonstrated, on January 17, 2017, at 3:55 p.m., Deputy Bolt was dispatched to 813 MacArthur Drive in Urbana for a reported armed robbery. Dispatch provided a general description of the armed robbery suspect as a black male, approximately 5 feet 6 inches tall and medium build, wearing blue jeans and a black hooded sweatshirt. Deputy Bolt testified the victim also reported the suspect left on foot. Within approximately 30 minutes of receiving the dispatch call, Deputy Bolt encountered defendant a block to a block and a half away from the scene of the armed robbery on a bicycle. Defendant matched the suspect's gender, race, approximate height, and approximate build. Defendant, like the suspect, was wearing blue jeans and a black hooded sweatshirt. Defendant was also wearing a black jacket and a blue hat.

¶ 35 Because the underlying facts are not in dispute, we will conduct a *de novo* review of whether Deputy Bolt had the requisite reasonable, articulable suspicion of criminal activity to justify a brief investigative detention based on the facts presented. See *People v. Manzo*, 2018 IL 122761, ¶ 25, 1129 N.E.3d 1141.

¶ 36 The United States Supreme Court has defined "reasonable suspicion" as " 'a particularized and objective basis' for suspecting the person stopped of criminal activity." *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)); see also 725 ILCS 5/107-14(a) (West 2016) ("A peace officer, after having identified himself as a peace officer, may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense *** and may demand the name and address of the person and an explanation of his actions. Such detention and temporary questioning will be conducted in the vicinity of where the person was stopped.").

¶ 37 The determination of whether an investigative detention was supported by the requisite reasonable, articulable suspicion of criminal activity requires a consideration of " ' "the totality of the circumstances—the whole picture." ' " *People v. Timmsen*, 2016 IL 118181, ¶ 9, 50 N.E.3d 1092 (quoting *United States v. Sokolow*, 490 U.S. 1, 8 (1989), quoting *Cortez*, 449 U.S. at 417). "Although 'reasonable, articulable suspicion' is a less demanding standard than probable cause, an officer's suspicion must amount to more than an 'inchoate and unparticularized suspicion or "hunch" ' of criminal activity." *Id.* (quoting *Terry*, 392 U.S. at 27). "The investigatory stop must be justified at its inception and the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those

facts, reasonably warrant the governmental intrusion upon the constitutionally protected interests of the private citizen." *Id.* In evaluating the officer's conduct, "we apply an objective standard and consider, 'would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?' " (Internal quotation marks omitted.) *Id.* (quoting *Terry*, 392 U.S. at 21-22).

¶ 38    Defendant contends this case is like *People v. Byrd*, 47 Ill. App. 3d 804, 808, 365 N.E.2d 443, 446 (1977), which found an investigatory detention was not supported by reasonable suspicion where the description of the suspect could have matched "a myriad of individuals" and the defendant's seizure was remote in time and place. We disagree. While it is true defendant, like the defendant in *Byrd*, matched a general description that could fit many individuals, Deputy Bolt, unlike the officer in *Byrd* who seized the defendant 24 hours after a reported robbery in an area 14 blocks from the location where the robbery occurred (*id.*), seized defendant within approximately 30 minutes of receiving the dispatch call in an area one to one-and-a-half blocks from the location where the armed robbery occurred. We find the time and place of defendant's seizure was not remote in time and place of the reported crime. See *People v. Starks*, 190 Ill. App. 3d 503, 507-08, 546 N.E.2d 71, 75 (1989) (concluding the officer's seizure of the defendant approximately 20 minutes after the robbery and one-and-a-half blocks from the scene was not unreasonably removed in time and place from the crime).

¶ 39    Defendant also contends this case is like *People v. Washington*, 269 Ill. App. 3d 862, 868, 646 N.E.2d 1268, 1272-73 (1995), which found an investigatory detention would not have been supported by reasonable suspicion even if the court were to consider testimony tendered in an offer of proof indicating the suspect was a black male wearing a blue coat and black hat who had fled westbound, as that testimony lacked the necessary specificity. We disagree. Initially, we note the *Washington* court's holding—which affirmed the trial court's judgment granting the defendant's motion to suppress—rested on the fact the State presented no evidence of the suspect's appearance, and the court only commented on the testimony tendered in the offer of proof "parenthetically." *Id.*; see *People v. Miller*, 355 Ill. App. 3d 898, 904 n.1, 824 N.E.2d 1080, 1085 n.1 (2005) (declining to consider *Washington*'s parenthetical finding); *People v. Booker*, 2015 IL App (1st) 131872, ¶ 49 n.3, 33 N.E.3d 227 (declining to consider *Washington*'s parenthetical finding). Moreover, the court's parenthetical finding that the testimony lacked the necessary specificity was based, in part, on the court's conclusion that the other evidence presented demonstrated the defendant's clothing at the time of the stop— " 'a blue Chicago Bears "starter jacket" ' "—was "distinctive and readily discernible" from the description of the suspect's clothing. *Washington*, 269 Ill. App. 3d at 868. In this case, no evidence was introduced to show the clothing defendant wore that otherwise matched the suspect's clothing was in any way distinct.

¶ 40    Finally, defendant asserts the fact he was wearing additional items of clothing and had a different form of transportation than the description provided for the armed robbery suspect demonstrates Deputy Bolt could not have had the requisite reasonable, articulable suspicion to justify a brief investigatory detention. We disagree. As the trial court noted, we find it would have been a reasonable inference to conclude the victim could have overlooked the additional items of clothing and/or the armed robbery suspect could have added clothing and changed his form of transportation during the 30-minute window from when the dispatch call was made to when Deputy Bolt encountered defendant. Similarly, we find it would have been a reasonable inference to conclude the armed robbery suspect may have remained in the neighborhood

following the armed robbery. See *People v. Walters*, 256 Ill. App. 3d 231, 236, 627 N.E.2d 1280, 1284 (1994) ("It is well established that a reasonable suspicion supporting an investigatory stop can be derived, in part, from observing suspects similar to those believed to be fleeing from a recent crime when the suspects are located in the general area where fleeing suspects would be expected to be found, given the time and distance from the crime scene.").

¶ 41 Again, it is this court's responsibility to consider the totality of the circumstances presented. *Timmsen*, 2016 IL 118181, ¶ 9. Based on the fact defendant substantially matched the description of the armed robbery suspect and the fact he was found in close proximity to the crime scene shortly after Deputy Bolt responded to the dispatch call, we conclude Deputy Bolt had the requisite reasonable, articulable suspicion to justify a brief investigatory detention. The trial court did not err in denying defendant's motion to suppress evidence.

¶ 42                                             III. CONCLUSION
¶ 43 We affirm the trial court's judgment.

¶ 44 Affirmed.